IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

---

No. 98-50908

---

RODOLFO BAIZA HERNANDEZ,

                                        Petitioner-Appellant,

versus

GARY L. JOHNSON, DIRECTOR,
TEXAS DEPARTMENT OF CRIMINAL JUSTICE,
INSTITUTIONAL DIVISION,

                                        Respondent-Appellee.

---

Appeal from the United States District Court
For the Western District of Texas

---

April 11, 2001

Before HIGGINBOTHAM, JONES, and DENNIS, Circuit Judges.

HIGGINBOTHAM, Circuit Judge:

A jury in the 207th Judicial District Court for Comal County, Texas, on September 25, 1985, convicted Rodolfo Baiza Hernandez of the capital murder of Victor Cervan. The jury gave affirmative answers to the questions required in Texas at the sentencing phase of the trial, and he was sentenced to death. After direct and collateral review by the state courts of his conviction and sentence, Hernandez brings this appeal from a denial of federal

habeas relief by the United States District Court.  He urges two points.

First, he urges that he was denied his Sixth Amendment right to counsel because a court-appointed psychiatrist testified at the sentencing phase of this trial regarding his future dangerousness, although the State refused to allow his counsel to be present at the doctor's examination of Hernandez.  Second, he urges that the statutory questions asked the jury in the sentencing phase did not allow the jury to consider in mitigation his evidence that he was abused as a child and suffered chronic paranoid schizophrenia.  We find these two contentions to be without merit and affirm dismissal of his federal petition.

I

Victor Cervan was one of five Mexican nationals attempting to make their way into this country by illegal passage across the Rio Grande northward to the area of Denton, Texas, in search of jobs on local ranches.  There is little dispute about their encounter with Hernandez, who happened upon them as they left a boxcar in the rail yard in San Antonio.  He offered to give them a ride north, for a fee.  Instead, assisted by Jesse Garibay, his brother-in-law, Hernandez took them to a remote area where he robbed them and shot them at close range, execution style.  All but Cervan survived, and

two of them testified against Hernandez at trial.[1]  The Texas Court of Criminal Appeals affirmed on direct review and the Supreme Court denied certiorari.[2]  In 1991 Hernandez filed a state petition for habeas relief, and in 1993 a special master filed proposed findings of fact and conclusions of law.  The state trial court adopted the master's proposals and recommended denial of all relief.  The Texas Court of Criminal Appeals determined that the findings of fact were supported by the record and denied relief.  The Supreme Court declined review a second time.[3]  The federal petition followed.  Two and one-half years later the district denied relief and granted a certificate of appealability on the two issues now before us.

## II

Since Hernandez filed his federal petition for habeas relief after the effective date of the AEDPA, his petition is controlled by that act.  Its most immediate provision[4] limits the authority of federal courts in habeas proceedings as follows:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

---

[1] *See Hernandez v. State*, 805 S.W.2d 409, 410-11 (Tex. Crim. App. 1990).

[2] *See id.; Hernandez v. Texas*, 500 U.S. 960 (1991).

[3] *Hernandez v. Texas*, 513 U.S. 1086 (1995).

[4] 28 U.S.C. § 2254(d) (2000).

3

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

In *Williams v. Taylor*,[5] the Supreme Court explained 2254(d)(1) as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

### III

Before trial Hernandez's counsel filed a motion requesting Judge R.T. Pfeuffer, the state trial judge, to appoint a "qualified disinterested expert at County expense to conduct a mental examination of the Defendant with regard to the Defendant's competency to stand trial, to file a written report in this Court within 30 days of the Order of Examination, and to testify regarding same at any trial or hearing upon such issue . . . [and] that this Court furnish defense counsel with copies of said report as soon as it becomes available." The motion also requested money to "enable

---

[5] 529 U.S. 362, 412-13 (2000).

4

the Defendant to select an expert of his own choice to examine the Defendant relative to his competency to stand trial" and "that Hernandez's counsel be notified of the time and place of the examination and he be allowed to attend, alternatively, that the examination be video taped and he be furnished a copy of the tape." Significantly, the motion also requested that the examiner file separate reports regarding the examiner's opinion of whether Hernandez was mentally ill or retarded and whether he required treatment. The latter request plainly looks beyond questions of competency to stand trial to the sentencing phase of the trial. The motion also requested that the examiner testify at trial or at a hearing on the issues.

Judge Pfeuffer granted the motion in part, appointing Dr. John Sparks with instruction to examine for competency to stand trial and for sanity at the time of the offense. He denied the request for appointment of an "independent" doctor, the request that counsel be notified and be allowed to be present, as well as the alternative request for videotaping.

Dr. Sparks conducted the examination. He gave Hernandez the required warnings that his statements could be used against him at trial, except, apparently, a specific caution that any statements could be used in the sentencing phase of a trial. Dr. Sparks gave no notice to defense counsel, and counsel was not present during the examination. The following month, in September, the trial judge convened a competency hearing before a jury at which both sides

5

offered evidence and Dr. Sparks testified regarding competency. The jury found that Hernandez was competent to stand trial. Defense counsel made no further requests for psychiatric assistance and did not attempt an insanity defense at trial.

Dr. Sparks made no appearance until the punishment phase of the trial, when the State called him as a witness. The State's direct examination made no mention of any examination by Dr. Sparks. Rather, the State proceeded by asking a narrative hypothetical question as a basis for Dr. Sparks' opinion as to whether a person with a similar history would be a danger to society. Dr. Sparks expressed the opinion that such conduct reflected an anti-social personality and that a person with this history would likely continue to be a danger to society. The difficulties began when defense counsel seized the opportunity to develop on cross-examination a mitigation theory that rested on an old diagnosis of chronic schizophrenia made of Hernandez during an earlier prison stay for robbery. He presented prison records to Dr. Sparks reflecting the diagnosis, eliciting testimony about periods of remission and its responsiveness to drugs and therapy. Dr. Sparks acknowledged the differences in the illnesses but maintained that nonetheless his earlier answers in response to the hypothetical "appear[ ] to be closest to a description that is labeled the anti-social personalty." He argued that such an afflicted person can experience periods of remission and with proper treatment live a productive life.

6

On redirect the State demonstrated that Dr. Sparks also had the benefit of the examination of Hernandez ordered by the court at Hernandez's request; and that in concluding that Hernandez was competent to stand trial, Dr. Sparks had decided that Hernandez had an anti-social personality. The Texas Court of Criminal Appeals described this exchange at trial as follows:

> [T]he State elicited redirect testimony from Dr. Sparks concerning appellant's competency evaluation in response to appellant's introduction of psychiatric evidence on cross-examination. By introducing appellant's TDC psychiatric records and soliciting Dr. Sparks' opinion concerning those records, appellant "opened the door" to the State's use of the results of his competency exam for rebuttal purposes. . . .

> By creating the impression that appellant may have been suffering from paranoid schizophrenia, appellant paved the way for the State to rebut that impression with psychiatric testimony tending to show that appellant was instead suffering from an anti-social personality disorder.[6]

The Texas court also concluded that Dr. Sparks did not express an opinion regarding future dangerousness, and that the trial court had specifically instructed the prosecutor that he could not do so. The Texas court explained:

> When the State began to elicit testimony concerning Dr. Sparks' competency examination, appellant immediately objected. At the subsequent hearing outside the jury's presence, the trial court ruled that the witness could testify as to his medical findings, but not as to whether appellant would likely commit future acts of violence that would constitute a danger to society. The essence of Dr. Sparks'[ ] testimony before the jury was his

---

[6] *Hernandez v. State*, 805 S.W.2d 409, 412 (Tex. Crim. App. 1990) (en banc).

diagnosis of anti-social personality disorder, along with a comment that had he been informed of appellant's prison psychiatric records, his diagnosis would have been a primary finding of paranoid schizophrenia in remission along with a secondary finding of an anti-social personality disorder. This testimony, while *relevant* to the issue of future dangerousness, was not a direct assertion of an expert opinion concerning future dangerousness.[7]

We agree with this reading of the record by the Texas court. At the least, it is both an objectively reasonable interpretation of the relevant events at trial and reasonable application of the decision of the Supreme Court in *Buchanan v. Kentucky*.[8]

The primary contention here is that the introduction of Dr. Sparks' testimony that he had examined Hernandez before the competency hearing denied Hernandez's right to counsel secured by the Sixth Amendment.[9]

---

[7] *Id.* at 412 n.3.

[8] 483 U.S. 402, 424-25 (1987) (stating that the focus of the Sixth Amendment right is not on the use of the doctor's report and that "the proper concern of this amendment [is] the consultation with counsel, which petitioner undoubtedly had. Such consultation, to be effective, must be based on counsel's being informed about the scope and nature of the proceeding. . . . Given our decision in *Smith*, however, counsel was certainly on notice that if . . . he intended to put on a 'mental status' defense . . . he would have to anticipate the use of psychological evidence by the prosecution in rebuttal.")

[9] There are suggestions that these events also violated Hernandez's right to not incriminate himself under the Fifth Amendment, although that separate contention has not been made to us. Regardless, neither contention, although resting upon distinct doctrines, can survive the analysis of *Buchanan*.

Hernandez initiated the examination for competency and other evidence of mental illness through his counsel and had a full opportunity to cross-examine Dr. Sparks at the competency hearing before trial. There is no suggestion that Hernandez did not have a full opportunity to consult with counsel about the scope of the examination, both with regard to its use to demonstrate competency and to develop possible mitigating evidence. As *Buchanan* teaches, defense counsel was on notice that if he attempted to put mental status in play, the State might draw upon the examination in rebuttal.

At the sentencing phase of trial on direct examination by the State's attorney, Dr. Sparks expressed an opinion based upon a hypothetical question and not upon his prior examination. The defense lodged no objection to the use of the hypothetical, apart from an error in the recitation, which was promptly corrected. The only deviation from that presentation came on redirect examination where Dr. Sparks' prior examination was disclosed in a shoring of Dr. Sparks' opinions regarding the relative play of schizophrenia, in remission and when treated by drugs, as compared to the diagnosis of anti-social disorder. We find no violation of the Fifth or Sixth Amendment in this circumstance.

These events differ from those of *White v. Estelle*,[10] and Hernandez's reliance upon it is misplaced. It is true that, as

_____

[10] 720 F.2d 415 (5th Cir. 1983).

9

here, the examiner of White testified in the sentencing phase in response to hypothetical questions, but little else of importance is similar. Defense counsel in *White* objected to the testimony, urging the trial court that the tailoring of the hypothetical was calculated to inform the jury of the earlier examination ordered on a motion by the State, not the defendant.[11] The federal habeas trial court later found that the examination "reasonably indicated that the psychiatric prognosis of White's future dangerousness was influenced by and derived from the court-ordered pretrial psychiatric examinations."[12] This was not the case with the hypothetical put to Dr. Sparks. Indeed, sensitive to *Estelle*, Judge Pfeuffer here instructed the prosecutor that he was to not ask Dr. Sparks "whether [Hernandez] would likely commit future acts of violence that would constitute a danger to society,"[13] for the reason that Judge Pfeuffer had not allowed defense counsel to be present when Dr. Sparks conducted the ordered examination of Hernandez. Disclosure of the court-ordered examination came here only in response to defense counsel's cross-examination which opened the door for its receipt. As applied here, this trial court ruling was no mechanical application of the familiar "you opened the door." Rather, it was a practical necessity to avoid the unfairness of

---

[11] *See id.* at 417 & n.1.

[12] *Id.* at 417.

[13] *Hernandez*, 805 S.W.2d at 412 n.3.

10

tying the prosecutor's hands while leaving defense counsel free to attack Dr. Sparks' opinions as lacking an informed basis.

IV

Hernandez contends that the jury could not give effect to evidence that he was subjected to sustained child abuse and chronic mental disease. The argument is that the jury could not give effect to these mitigating circumstances under the questions asked them as explained in *Penry v. Lynaugh*.[14] As demonstrated by defense counsel in closing argument, the evidence of chronic schizophrenia could be considered by the jury in answering the question of future dangerousness, an argument counsel had carefully laid the support for in his cross-examination of Dr. Sparks. With medication and treatment, remission can be sustained.

We have repeatedly held that evidence of child abuse alone, unlinked to the offense, is not mitigating.[15]

V

We have heard argument in this case and carefully considered the opinions of the courts that have previously decided these

_____

[14] 492 U.S. 302 (1989).

[15] *See Davis v. Scott*, 51 F.3d 457, 461-62 (5th Cir. 1995) (evidence of child abuse, alone, without demonstrating any link to the crime, does not constitute "constitutionally relevant mitigating evidence"); *Madden v. Collins*, 18 F.3d 304, 308 (5th Cir. 1994) (evidence of troubled childhood not constitutionally relevant mitigating evidence when not linked in any way to the crime); *Barnard v. Collins*, 958 F.2d 634, 638-39 (5th Cir. 1992) (rejecting *Penry* claim where crime not attributable to the proffered evidence of troubled childhood).

11

questions, including a detailed opinion by the district court below, and find no error.  We affirm the dismissal of the writ of habeas corpus and dissolve the stay of execution.

AFFIRMED.

DENNIS, Circuit Judge, dissenting:

The questions presented are whether Rodolfo Baiza Hernandez's Sixth Amendment right to counsel, as defined in Estelle v. Smith, 451 U. S. 454 (1980), was violated; whether he was sentenced to death in violation of the Eighth Amendment because the jury was not instructed that it could consider and give effect to the mitigating evidence of his abused childhood by declining to impose the death penalty, as required by Penry v. Lynaugh, 409 U.S. 302 (1989); and whether the judgment of the Texas Court of Criminal Appeals refusing to set aside his death sentence "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," within the meaning of 28 U.S.C. § 2254(d)(1) (1994 & Supp. 2000). Because these questions should be answered affirmatively, instead of negatively as in the majority opinion, I respectfully dissent.

I.

The majority opinion's analysis is flawed because of its failure to recognize that the state habeas trial court made no ruling on Hernandez's Sixth Amendment claim; and that the Texas Court of Criminal Appeals's per curiam order adopting the state habeas trial court's "findings and conclusions" therefore either had no legal basis whatsoever or else unconstitutionally conflated its analysis of the defendant's Fifth and Sixth Amendment rights, contrary to the clearly established Federal law

13

as determined by the Supreme Court of the United States.

The majority opinion mistakenly relies on the opinion of the Texas Court of Criminal Appeals on direct appeal in Hernandez v. State, 805 S.W.2d 409 (Tex. Crim. App. 1990), as if it were the factual findings and rulings of law of that court with respect to Hernandez's Sixth Amendment habeas corpus claim. On direct appeal, the Texas Court of Criminal Appeals reviewed only Hernandez's Fifth Amendment claim. Regarding his Sixth Amendment state habeas claim, the state habeas trial court and the special master found additional facts relating specifically to the Sixth Amendment claim. But the trial court clearly deferred any ruling on that claim, noting that "the question is presented as to whether or not the decisions of Estelle v. Smith . . . and Powell v. Texas [492 U.S. 680 (1989)] require the presence of counsel where the state's mental health expert's testimony is 'not a direct assertion of an expert's opinion concerning future dangerousness', but rather, some other form of mental health diagnosis harmful to the defendant's case." The special master and the state habeas trial court did not–as the majority opinion expresses–recommend the denial of relief, but recommended that "the Texas Court of Criminal Appeals should review this issue closely to determine if there is such a requirement."

The Texas Court of Criminal Appeals, on the state habeas appeal, did not review the issue or make any additional factual findings from the record. That court, without oral argument, merely issued a per curiam order holding that "[t]he findings and conclusions [of the special master adopted by the trial court] are supported by the record and upon such basis the relief sought is denied."

Accordingly, the majority opinion of this court mistakenly assumes that the full opinion

14

of the Texas Court of Criminal Appeals on direct appeal, which pertained only to Hernandez's Fifth Amendment argument on appeal, was that court's ruling on Hernandez's Sixth Amendment habeas claim. Of course, it was not. On Hernandez's habeas appeal, the Texas Court of Criminal Appeals said it was denying relief based on the findings of fact and conclusions of the habeas trial court. But because the trial court did not make any ruling or reach any conclusion, the decision of the Texas Court of Criminal Appeals presently under review really has no tangible legal basis.

Only by a highly creative assumption can this court read into the Texas Court of Criminal Appeals's terse per curiam order any kind of a reasoned disposition of Hernandez's Sixth Amendment habeas claim. The only reasonable creative assumption would be that the per curiam represents a conflation of analysis of Hernandez's Fifth and Sixth Amendment claims and a conclusion that they can both be rejected constitutionally for the same reason. That decision, however, is one that is contrary to, and an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States. This issue, and the reasons that the majority opinion also misapprehends Hernandez's Eighth Amendment claim, are addressed in detail below. Before addressing these major legal issues in more detail, however, it is first necessary to point out the majority's errors in misconstruing the procedural and factual context of this case.

The majority opinion quotes a small, selected portion of the defense counsel's pretrial motion for a qualified disinterested expert to conduct a mental examination of the defendant with regard to his competency to stand trial and his sanity at the time of the offense. The majority opinion then mischaracterizes the defense motion as

15

containing a request that "looks beyond questions of competency to stand trial to the sentencing phase of the trial. The motion also requested that the examiner testify at trial or at a hearing on the issues." Maj. Op. at 5. The defense motion, however, contains no reference to the sentencing phase but is clearly aimed only at gaining expert assistance to evaluate whether Hernandez was competent to stand trial or whether to advise him to plead not guilty by reason of insanity. The state habeas trial court made the factual finding that Hernandez's counsel's "request for the appointment of an expert was made solely for the purposes of examining the defendant relative to his competency, filing a report, and testifying regarding competency at any trial or hearing." (Emphasis in original) (internal quotations and brackets omitted). And, contrary to the majority opinion's characterization of the defense motion as a request for testimony at trial on the issues, the defense motion specifically limited the request for testimony on Hernandez's competency to stand trial–not for testimony at the guilt or penalty phases of a capital murder trial.

The majority opinion mischaracterizes the state trial court's ruling on the defense pretrial motion as "grant[ing] the motion in part." Maj. Op. at 5. The court, in fact, denied the defense counsel's motion entirely and sua sponte entered an order sharply inconsistent with the objects of the motion. The state habeas trial court made this clear when it found as a fact that the "trial court den[ied] this motion." (Emphasis in original).

The majority opinion's statement that "[t]he State's direct examination made no mention of any examination by Dr. Sparks . . . ," Maj. Op. at 6, is misleading. Dr. Sparks, in presenting his qualifications as an expert in predicting future dangerousness of criminals, told the jury that he had examined and testified

16

with respect to approximately 1500 persons charged with crimes to evaluate their competency to stand trial and their sanity at the time of their alleged offenses. The prosecutor, in his "hypothetical" question, described a criminal and a crime matching in minute detail Hernandez and the evidence introduced against him at the guilt phase of the trial. It is almost certain that reasonable jurors would have understood that Dr. Sparks's prediction of future dangerousness referred to Hernandez or someone identical to him who had committed a crime identical to his. It is also highly probable that reasonable jurors would have inferred that Hernandez was one of the 1500 persons charged with crimes who had been examined psychiatrically by Dr. Sparks.

The majority opinion does not present the facts objectively or impartially when it states that "[t]he difficulties began when defense counsel seized the opportunity to develop on cross-examination a mitigation theory that rested on an old diagnosis of chronic schizophrenia made of Hernandez during an earlier prison stay for robbery." Maj. Op. at 6. It is easy to understand why the prosecution would advocate this view. But in truth the difficulties began when the prosecution called Dr. Sparks, who had examined Hernandez without giving notice to his enrolled defense counsel, and had the doctor, under the guise of a transparent hypothetical, diagnose Hernandez as a person having an "antisocial personality" and predict that "there's a high likelihood that he would continue to perform acts that are a danger to society." Defense counsel introduced Hernandez's prior medical records without any objection by the prosecution. Defense counsel properly used these records to impeach the testimony of Dr. Sparks that Hernandez was a sociopathic menace to society as erroneous because he had not taken into account the

17

reliable diagnoses of Hernandez as a chronic paranoid schizophrenic. The prosecutor then aggravated those "difficulties" by attempting to rehabilitate his witness on redirect by asking Dr. Sparks about his pretrial psychiatric examination of Hernandez and the doctor's diagnosis of Hernandez's mental condition at that time.

There is no legal or factual basis for the majority's assertion that, "There is no suggestion that Hernandez did not have a full opportunity to consult with counsel about the scope of the examination, both with regard to its use to demonstrate competency and to develop possible mitigating evidence." Maj. Op. at 9. The burden is on the State to prove its defense to Hernandez's Sixth Amendment claim–that Hernandez had actual notice of the scope of the pretrial psychiatric examination–not on Hernandez to prove his lack of knowledge. 2 JAMES S. LIEBMAN & RANDY HERTZ, FEDERAL HABEAS CORPUS PRACTICE AND PROCEDURE § 31.2, at 1322 (1998 & Supp. 2000) ("[T]he state . . . bears the burden of proving by a preponderance of the evidence all dispositive facts necessary to establish the prerequisites for a defense on which it relies."); see, e.g., Satterwhite v. Texas, 486 U.S. 249, 255 (1988) (rejecting State's argument that a defendant may be constructively notified of the scope of a pretrial examination). Factually, the assertion that there has been "no suggestion" that Hernandez was not given the opportunity to consult with his counsel about the possibility that the pretrial psychiatric examination might encompass the penalty phase future dangerousness issue is also incorrect. The Texas Court of Criminal Appeals found unequivocally that "[t]he record does not demonstrate that Dr. Sparks warned [Hernandez] that anything [he] said could be used against him at a sentencing proceeding."

18

Hernandez v. State, 805 S.W.2d 409, 411 n.2 (Tex. Crim. App. 1990) (en banc). And, as recognized by the federal district court in these proceedings, "it is uncontested petitioner's trial counsel w[ere] never advised Dr. Sparks'[s] competency evaluation would also address the issue of petitioner's future dangerousness." Memorandum Opinion and Order at 103.

Indeed, there was ample evidence that neither Hernandez nor his counsel were informed that his statements could be used by Dr. Sparks at a capital penalty trial to predict his future dangerousness. The state trial court, in its pretrial psychiatric examination order, did not give Hernandez or his counsel such notice. Dr. Sparks testified that he did not give Hernandez notice prior to the psychiatric examination that the examination data could be used by the doctor to testify against him at the death penalty hearing. The state courts never found that Hernandez or his counsel had notice that the pretrial psychiatric examination could encompass the future dangerousness issue, and it is error for the majority to make such an inference from the record here.

The majority opinion also micharacterizes the facts of the state proceedings when it states that "[t]he defense lodged no objection to the use of the hypothetical, apart from an error in the recitation." Maj. Op. at 9. Defense counsel also objected to the hypothetical question on the grounds that it called for Dr. Sparks to express an expert opinion on future dangerousness without first establishing the medical knowledge, techniques, and data in the particular case upon which his opinion was based; and to Dr. Sparks's testimony to whether Hernandez will have a future mental state or condition because that is an ultimate issue for the jury alone.

In order to understand the significance

19

of the legal errors the majority opinion leaves uncorrected, the factual and procedural background of Hernandez's claims must be fully and accurately set forth.

## II.

## A.

On May 15, 1985, Rodolfo Baiza Hernandez was charged by indictment with the March 7, 1985, murder of Victor Cervan, one of five Mexican nationals whom he had robbed, shot, and abandoned in a remote area of Comal County, Texas. On April 8, 1985, the 207th Judicial District Court for Comal County, Texas, in New Braunfels, appointed two attorneys in private practice to represent him. At his arraignment, Hernandez pleaded not guilty. The State announced its intention to seek the death penalty.

On August 23, 1985, defense counsel for Hernandez filed a motion alleging that (1) the defendant was not competent to stand trial due to his inability to understand the proceedings or to rationally consult with counsel; (2) the defendant had been examined and treated for mental disorders from 1969 to 1985 by medical experts of the United States Army, the Texas Department of Corrections ("TDC"), and Bexar County, Texas; and (3) counsel had not been able to determine whether to present an insanity defense.

The defense counsel's motion requested that the court (1) appoint a "qualified disinterested expert at County expense to conduct a mental examination of the Defendant with regard to [his] competency to stand trial," and to file a written report of the examination with the court and counsel; (2) grant defense counsel funds and permission to select an expert to examine the defendant relative to his competency to stand trial; (3)

20

notify defense counsel as to the date, time, and place of the examination to enable counsel to attend the examination; (4) take notice that defense counsel "specifically objects to any such examination unless the defense counsel are afforded an opportunity to be present"; (5) alternatively, order the entire examination video-recorded for defense counsel's use and benefit; (6) order the medical examiner to include in his report observations and findings regarding Hernandez's competence to stand trial, his status as to mental illness and retardation, and required or recommended observation, treatment, or hospitalization; and (7) schedule a hearing to determine whether the defendant was competent to stand trial.

The state trial court on August 23, 1985, entered an order (1) denying defense counsel's requests for funds with which to employ an independent psychiatrist to examine and report on Hernandez's mental capacity, advance notice of the time and location of the examination, the right to attend the examination, and the right to select a court-appointed expert; (2) appointing Dr. John C. Sparks, a psychiatrist employed by the Bexar County, Texas, courts, "whose address is 2nd Floor, Bexar County Jail, San Antonio, Texas," to conduct a mental examination of Hernandez regarding competency to stand trial, file a written report with the court, and furnish a copy to defense counsel no later than August 30, 1985; (3) ordering the Comal County Sheriff's Department to transport Hernandez to Dr. Sparks's office for the examination; (4) declaring that Dr. Sparks would be advised by the court of the facts and circumstances of Hernandez's charged offense "and the meaning of incompetency to stand trial"; (5) ordering Dr. Sparks to include in his written report a description of the examinations and procedures used, the doctor's observations and findings pertaining

to competence to stand trial, the doctor's opinion as to Hernandez's mental illness or retardation, and the doctor's prescription of needed observation, treatment, or hospitalization; (6) ordering Dr. Sparks to complete and submit a Certificate of Medical Examination for Mental Illness, if necessary; (7) ordering Dr. Sparks to conduct a mental examination of Hernandez as to the issue of insanity at the time of the alleged offense and file a written report in this regard with the court and counsel, containing a description of the examination procedures, observations and findings pertaining to the insanity defense; (8) ordering that a pretrial hearing on the defendant's mental competency to stand trial be held by the trial court on September 9, 1985, at the Comal County Courthouse, New Braunfels, Texas; and (9) ordering that the defendant be permitted to notify the court and the State whether he intended to offer evidence of the insanity defense within twenty-four hours after receipt of the expert's report.

Hernandez was transported to San Antonio, Texas, by the Comal County Sheriff's Department, where, on August 26, 1985, Dr. Sparks, a forensic psychiatrist employed full-time by the Bexar County courts, interviewed Hernandez in custody at the Bexar County jail in San Antonio for approximately eighty minutes and concluded that he was competent to stand trial. Dr. Sparks did not obtain or review Hernandez's U.S. Army or TDC psychiatric or medical records, although defense counsel's motion put the court and Dr. Sparks on notice of them. Dr. Sparks obtained and reviewed a single report by Dr. Richard Cameron, an employee of the Bexar County courts, dated April 2, 1974, regarding a psychiatric examination conducted for the purposes of determining Hernandez's competency to stand trial for two aggravated robbery charges. Dr.

22

Cameron's report concluded that Hernandez "present[ed] the clinical picture of schizophrenia, schizo-affective type, with paranoid ideation." In a letter to the trial judge attached to his official report, Dr. Sparks reported his findings that Hernandez was mentally competent to stand trial and probably had been since March 7, 1985; that Hernandez was neither mentally ill nor mentally retarded; and that Hernandez suffered from an antisocial personality disorder. In the body of the report itself, Dr. Sparks observed that he "found no evidences [sic] from []his examination to suggest the presence of the psychosis described in 1974"; but he did not otherwise refer to or discuss Dr. Cameron's 1974 diagnosis of Hernandez's schizophrenia. The record reflects that Dr. Sparks's report was mailed to defense counsel on August 27, 1985.

Hernandez's defense counsel were not informed that the scope of the psychiatric examination of Hernandez by Dr. Sparks on August 26, 1985, would encompass the issue of Hernandez's future dangerousness. The court's August 23, 1985, order did not notify defense counsel that the examination would include an inquiry into Hernandez's future dangerousness. Defense counsel's motion had not asked for an inquiry into future dangerousness, and they had specifically objected to any examination unless they were afforded notice and an opportunity to be present. The trial court denied the defense counsel's motion entirely. Therefore, the pretrial psychiatric examination of Hernandez was not the kind of examination his counsel had requested. Instead, it was the type of examination to which defense counsel had expressly objected.

Moreover, contrary to the majority's assertion, Hernandez's counsel's original request for a separate report regarding mental illness or retardation did not in any way

23

indicate that they expected, were given notice, or agreed that future dangerousness would be within the scope of the pretrial examination by a disinterested expert that they requested. Defense counsel's motion cited its uncertainty about whether to pursue an insanity defense at trial, and made no mention of sentencing issues; therefore, the record only supports reading the request for a separate report on mental illness and retardation as preparation of a mental status defense at trial, and not as an anticipation of the sentencing issue of future dangerousness. By reading such anticipation into the defense counsel's motion, the majority jumps to a conclusion that has no support in the record. Indeed, the state habeas trial court's fact-findings, to which we are bound to accord a presumption of correctness, 28 U.S.C. § 2254 (e)(1) (2000), state clearly that the "request for the appointment of an expert was made solely for the purposes of examining the defendant relative to his competency, filing a report, and testifying regarding competency at any trial or hearing." (Emphasis in original) (internal quotations and brackets omitted).

Furthermore, Dr. Sparks testified that he did not warn Hernandez before the examination that anything he said could be used against him at a sentencing phase. See Hernandez v. State, 805 S.W.2d 409, 411 n.2 (Tex. Crim. App. 1990) (en banc) (noting that deficiency in the record, and citing Powell, 492 U.S. at 681 (in turn citing Estelle v. Smith, supra, which precludes a State's psychiatric examination of a capital defendant encompassing the issue of his future dangerousness unless his counsel is notified in advance of the scope of the examination and the defendant is also forewarned)).

At the competency trial, Dr. Sparks testified that he had examined Hernandez on August 26, 1985. Dr. Sparks testified that,

24

despite suffering from an antisocial personality disorder, Hernandez was mentally competent to stand trial. In the report filed by Dr. Sparks and introduced into evidence at the competency hearing, he concluded that Hernandez was neither mentally ill nor retarded. The defense counsel agreed to the introduction of the report "for the purposes of [the competency] hearing only." The majority incorrectly faults Hernandez's counsel for not objecting to Dr. Sparks's testimony during the competency hearing. The hearing was limited to Hernandez's competency to stand trial. That is all Dr. Sparks testified to at that hearing; he said nothing about Hernandez's future dangerousness. Therefore, Dr. Sparks's testimony regarding the pretrial psychiatric examination was not objectionable, and Hernandez's counsel had no reason to believe that that examination would later be used improperly during Dr. Sparks's penalty phase testimony.

On September 12, 1985, the competency trial jury found Hernandez competent to stand trial, and the trial court rendered judgment to that effect, which was signed on September 16, 1985.

B.

After a three-day guilt-phase trial, Hernandez was convicted by a jury of capital murder on September 25, 1985.

At Hernandez's capital punishment sentencing hearing on September 26, 1985, the prosecution introduced additional evidence: (1) the testimony of two law enforcement officers that Hernandez had a bad reputation in the community regarding peace and law-breaking; (2) a "pen packet" identifying Hernandez as having been convicted in 1974 for two separate armed robberies; (3) testimony of Hernandez's former parole officer

25

that Hernandez's parole from his prison sentence for the armed robbery convictions had been revoked in 1983 for possession of two handguns; and (4) the testimony of Dr. Sparks.

Dr. Sparks was called as an expert witness in the field of forensic psychiatry by the prosecution. He testified that he was a psychiatrist employed by Bexar County, Texas; that he graduated from the University of Illinois College of Medicine in 1953 and had completed a residency in psychiatry at the Illinois Psychiatrist Institute in 1960; that he was licensed in Michigan and Texas and certified by the American Board of Psychiatry; that he had worked in the military as a psychiatrist for twenty years; and that for the past five years he had worked for the state courts in Bexar County as a forensic psychiatrist engaged in examining and testifying with respect to approximately 1500 persons charged with crimes to evaluate their competency to stand trial and their sanity at the time of their alleged offenses.

Dr. Sparks was not tendered to defense counsel for cross-examination on his qualifications or on the relevance and reliability of his opinion; nor does the record show that the court found him to be qualified or his opinion reliably and relevantly based on the methodology of his field of expertise and the facts and data in the particular case. Defense counsel, however, did not make any threshold objection to Dr. Sparks's testimony.

On direct examination, the prosecution asked Dr. Sparks what it termed a "hypothetical" question. First, the prosecutor asked Dr. Sparks to assume as true a detailed description of a capital murder by a so-called "hypothetical" offender, as well as a detailed description of the prior criminal record of that offender. Second, Dr. Sparks was asked to express his opinion as to whether the offender

26

would commit criminal acts of violence that would constitute a continuing threat to society. The defense counsel objected that the prosecution had failed to establish an evidentiary or medical basis for such an opinion; that the opinion would either be a baseless conclusion or else would be based on extrajudicial evidence in violation of Hernandez's right to confront the witnesses against him; and that Dr. Sparks's answer would constitute an opinion upon the ultimate issue of future dangerousness and thus an invasion of the province of the jury. After the trial court overruled the objection, defense counsel moved for a mistrial on grounds that the jury would be unfairly and unduly prejudiced by Dr. Sparks's opinion as to future dangerousness for which the prosecution had established no evidentiary basis, but the court overruled that objection also. Pursuant to the trial court's rulings, Dr. Sparks testified that, in his opinion,

"there's a high likelihood that he would continue to perform acts that are a danger to society."

The prosecution's question plainly referred to the particular evidence that had been presented against Hernandez in both the guilt and penalty phases of the trial. The criminal record Dr. Sparks was asked to assume mirrored Hernandez's "pen packet," introduced into evidence at the penalty phase. The detailed description of the so-called "hypothetical" murder identically matched the unique details and circumstances of the capital murder of which the jury had found Hernandez guilty.[16]    Consequently, the jury

---

[16]    The prosecutor described the criminal conduct of the hypothetical offender as follows:

> [P]lease assume the following[:] That on March 7, 1985, this man introduced himself to five illegal aliens in San Antonio, that he made a deal to take them to Dallas and that he got his brother-in-law out of bed who then along with this person drove the five men to a remote area in northwest

27

Comal County[.] Assume further that this person and his brother-in-law got the five men out of the car and at gunpoint walked them up a small hill[.] Assume further that in walking them up that hill one of the five men stumbled and was shot by this person in the back[.] Assume that this person then made all five men lay down face up[.] Assume further that this person then at gunpoint demanded their possessions or property and then began systematically shooting each of them[.] Assume further that on at least two of the men that the gun was no more than two to four inches from their throats when he fired the gun into their body[.] Assume further that after this person emptied the first gun of bullets, he went to his brother-in-law and exchanged guns and then returned firing the gun once more at the men on the ground[.] Assume further that this person and his brother-in-law then left all five men who had been seriously injured by gunfire and drove away[.] Further assume that this person arrived at his mother's house and upon hearing the news of the shooting of the five illegal aliens on the day of the crime, he stated that President Reagan had called him and that the President had told him, had called him personally to his house and said that the State was overpopulated and asked him to help him get rid of some of the aliens that were coming over here to San Antonio, to the United States, and that he then began laughing, twirling a gun and stating he was a gun-slinger[.] Assume further that shortly thereafter this person was with another man and that this person was twirling two guns with his hands, and after hearing another broadcast about the

28

must have understood that Dr. Sparks was referring to Hernandez or an offender identical to him when he said "there's a high likelihood that he would continue to perform acts that are a danger to society." Also, it is likely that the jurors reasonably assumed that a psychiatrist possessing Dr. Sparks's qualifications must have had an adequate

---

shooting of the five illegal aliens this person said he had killed one of the illegal aliens and shot the others, that President Reagan had called him and said that the United States is overpopulated, that so many people needed to be killed during a certain time, and was laughing and talking about it.

basis in fact and medical knowledge to support such an opinion. See, e.g., Satterwhite v. Texas, 486 U.S. 249, 259 (1988).

On cross-examination, without objection by the prosecution, defense counsel introduced Hernandez's TDC medical records showing that he had been diagnosed and treated while in prison, for chronic paranoid schizophrenia; and that Hernandez's treatment had included antipsychotic drugs (Stelazine and Thorazine), electro-convulsive treatments, neurotone treatments, and psychotherapy. Further, defense counsel elicited testimony from Dr. Sparks that chronic paranoid schizophrenia fluctuates between stages of acuteness and remission, but is considered to be a lifelong illness; that the symptoms of the disease can be reversed or controlled, however, by medication, psychotherapy, and environmental changes; that unrealistic or illogical thinking and auditory hallucinations, as, for example, a belief in hearing spoken commands or

29

instructions by an authority figure, such as the President, are common symptoms of the disease; and that, if Hernandez had been correctly diagnosed as having chronic paranoid schizophrenia, it was possible that he was besieged by hallucinations before, during, and after his commission of the capital murder and related offenses. With this evidence, defense counsel sought to demonstrate that Dr. Sparks's opinion could not relevantly or reliably assist the jury in deciding whether there was a probability that Hernandez would commit criminal acts of violence that would constitute a continuing threat to society, because in forming his opinion Dr. Sparks had been asked to assume only the offender's criminal acts and had not been asked to assume the significant factor of chronic paranoid schizophrenia that was present in Hernandez's medical history. Also, when asked by defense counsel whether forensic psychiatry was an exact science like mathematics, Dr. Sparks replied that it was "[n]ot exactly guesswork but experience and use of what contacts we've had with the person." Thus, the jury may have gathered that Dr. Sparks's opinion regarding Hernandez's future dangerousness was based on actual contacts with Hernandez.

On redirect examination, the prosecutor asked Dr. Sparks for his opinion as to the type of "personality behavioral problem[ of] the man that was described in my hypothetical to you . . . would have?" Dr. Sparks testified: "Assuming a great deal, because it did not describe him but it described certain things in his life, the behavior appears to be closest to a description that is labeled the antisocial personality." Thus, at this point, Dr. Sparks, by "assuming a great deal" that had not been introduced into evidence, made a psychiatric diagnosis of the "hypothetical" offender as having an antisocial personality. Accepting the prosecutor's invitation to elaborate on "love

30

and compassion relative to these individuals," Dr. Sparks added, "they have very little concern about others. They tend to be focused on their own desires and forget any consequences that might occur or the effect on other people." Further, Dr. Sparks agreed with the prosecutor's suggestion that it would "be fair to say then that this type of person could kill without any problem whatsoever."

On recross examination, Dr. Sparks agreed with defense counsel that a person with paranoid schizophrenia can have problems with love, marriage, legal violations, fear of other people, and bizarre behavior. At defense counsel's request, Dr. Sparks examined Hernandez's TDC medical records and testified that Hernandez appeared to have been confined in the prison's psychiatric treatment unit between September 10 and November 11, 1975; that Hernandez was on medication during his confinement there; and that, "at that time [] [h]is diagnosis was schizophrenic, paranoid type, chronic, moderately severe; and his prognosis . . . was guarded, meaning that the doctor did not know whether he would continue to function well or would again have an illness as severe as he had had."

On redirect examination, the prosecutor abruptly abandoned the posture of asking hypothetical questions and immediately asked Dr. Sparks if he had examined Hernandez in August 1985. When the doctor answered in the affirmative, the prosecutor asked: "Based on that examination what was your impression?"

The court interrupted and asked counsel to approach the bench. In the bench conference, the defense counsel stated that he would object to "all of this[.]" The prosecutor argued that the defense counsel had "opened the door" by going "into his medical past which we didn't touch." The jury was sent

31

out.

Out of the presence of the jury, defense counsel objected to the question on the grounds that Hernandez had made statements prejudicial to his penalty phase defense during the examination without valid waivers of Hernandez's rights under the Fifth and Sixth Amendments. The court invited the prosecutor to examine the doctor concerning the advice of rights. Dr. Sparks testified that, prior to the examination, he reviewed with Hernandez an outline of the advice of rights, had him read it, and Hernandez signed it. The doctor further testified that the rights as he had them listed were the right to remain silent, to have his attorney present during the examination, and to terminate the examination, but that the rights did not include a warning that anything Hernandez said during the examination could be used against him at the penalty phase of the trial; and that "Mr.

Hernandez read it through and he signed a form that I have provided for that purpose indicating that he understood what was on the form." During these proceedings, the State did not offer any evidence to show that defense counsel had been notified or given an opportunity to confer with Hernandez prior to Dr. Sparks's psychiatric examination of him.

The court ruled that the witness would be allowed "to testify as to his medical findings, all of which have been opened up by questions presented by" defense counsel. However, the court also ruled that, because it had denied the defense counsel's request to be present during the examination, "this witness will not be allowed to testify about any probabilities that Hernandez would be a continuing threat to society based upon the interview." The court noted that defense counsel had re-urged his objection and would have a continuing bill of exception.

When the jury returned, Dr. Sparks, on

redirect examination, testified that he had examined Hernandez in August 1985 and diagnosed "the type of personality or type of problem" he had as "301.70 antisocial personality disorder." On recross, he testified that he conducted a "mental status examination" of Hernandez for eighty minutes; that a mental status examination does not cover any family history; that he asked for but did not obtain or review Hernandez's TDC medical records for purposes of his examination, report, and competency hearing testimony; that he would like to have had them during the examination because they were important; that he would like to have known if Hernandez was taking a drug like Doxepin at that time because that was important; and that he did not examine Hernandez physically or perform any medical tests on him. On redirect, Dr. Sparks testified that, if he had reviewed Hernandez's prison medical records prior to his examination, rather than for the first time during the penalty hearing, he would have made two diagnoses instead of one: "The initial diagnosis would have been paranoid schizophrenia in remission, the second diagnosis would be antisocial personality disorder." On recross, Dr. Sparks testified that Hernandez's chronic paranoid schizophrenia could have been in an acute stage, rather than in remission, at the time of the crime on March 7, 1985. On redirect, the court overruled defense counsel's objection to lack of proper predicate and allowed the prosecutor to elicit the following testimony from Dr. Sparks:

> People who have [chronic paranoid schizophrenia] . . . are generally well organized, are generally reasonably intelligent, and although the plans may be part of the illness, they can make and do make plans. When they're free

33

of the illness the plans deal with a real situation, during the illness they frequently deal with delusional ideas.

He also testified, "In the description given to me in the [prosecutor's initial hypothetical question,] there was no indication of any illness; there was indication of a particular kind of behavior, and that is the type of behavior found in antisocial person [sic] disorder." On final recross, the doctor agreed with defense counsel that

it's possible for someone [with paranoid schizophrenia] to think or believe that they're President Reagan's right-hand man, a gun-slinger, and they have heard voices of President Reagan and carry out a plan for [him] and still be able to do other things that would seem to be normal . . . and be suffering from the disease of paranoid schizophrenia.

In summary, Dr. Sparks testified that he had previously examined Hernandez for mental competency and, based on that examination and Hernandez's TDC medical records introduced at the penalty hearing, was of the opinion that (1) Hernandez had an antisocial personality; (2) Hernandez also had chronic paranoid schizophrenia; (3) chronic paranoid schizophrenia is a continuing, fluctuating, incurable mental illness that can be controlled by antipsychotic medication, therapy, and environmental changes; (4) an antisocial personality is a permanent mental condition that cannot be cured by any treatment or medication; (5) at the time of Dr. Sparks's mental competency examination, Hernandez's chronic paranoid schizophrenia was in remission and was not being suppressed by

34

medication; (6) at the time of the crime it is possible that Hernandez's chronic paranoid schizophrenia was active, rather than in remission, although Dr. Sparks could not opine as to which; and (7) anyone having an antisocial personality such as Hernandez's, as determined by Dr. Sparks from his examination of Hernandez and the information supplied him about Hernandez's criminal activity, probably would present a continuing threat to society.

In Hernandez's defense at the penalty hearing, his attorney elicited the testimony of his cousin, who had lived with his family while he was a child. She testified that Hernandez had been the victim of severe physical and mental abuse between the ages of three and thirteen years. The cousin indicated that Hernandez, as the oldest child, received the brunt of his mother's physical abuse, which in turn stemmed from her own continual physical abuse by her husband.

The cousin testified to two particular incidents she had witnessed. When Hernandez was still a small child, she said, his mother had beaten him with a broom, breaking the broom handle over his head and leaving him lying on the floor. In another incident, she testified, he had been taken into a bedroom by his parents and beaten severely with a large-buckled belt. Defense counsel also introduced drug records from the county jail, which showed that Hernandez had regularly signed receipts for doses of Doxepin, a tranquilizer and antidepressant, for five days prior to his mental examination by Dr. Sparks.

In accord with the capital sentencing statute then in effect,[17] Hernandez's jury was

---

[17] TEX. CODE CRIM. PROC. ANN. art. 37.071(b)(1) & (2) (Vernon 1981). The third special issue authorized by article 37.071(b)(3)–"if raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased[]"–was not presented to Hernandez's jury. Neither the State nor Hernandez objected to its omission. In 1991, the Texas Legislature substantially amended the statute

instructed that it was to answer two "special issues":

[1] Was the conduct of the Defendant, RODOLFO BAIZA HERNANDEZ, that caused the death of the deceased, VICTOR MANUEL SERRANO CERVAN, committed deliberately and with the reasonable expectation that the death of the deceased or another would result?

* * *

[2] Is there a probability that the Defendant, RODOLFO BAIZA HERNANDEZ, would commit criminal acts of violence that would constitute a continuing threat to society?

The jury was also instructed that

in determining each of these Special Issues you may take into consideration all of the evidence submitted to you in the full trial of the case, that is, all of the evidence submitted to you in the first part of this case wherein you were called upon to determine the guilt or innocence of the Defendant, and all of the evidence, if any, admitted before you in the second part of the trial wherein you are called upon to determine the answers to Special Issues hereby submitted to you.

The jury was not specifically instructed that it

_____

by, inter alia, adding a requirement that the jury, after returning an affirmative finding on each special issue, answer: "Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that sentence of life imprisonment rather than a death sentence be imposed." TEX. CODE CRIM. PROC. ANN. art. 37.071(e)(1) (Vernon 2000).

36

could consider or give effect to "mitigating evidence."

The jury unanimously answered "yes" to the two requisite questions, and, as required by Texas law, the trial court sentenced Hernandez to death. The Texas Court of Criminal Appeals affirmed Hernandez's conviction and death sentence. Hernandez v. State, 805 S.W.2d 409 (Tex. Crim. App. 1990) (en banc). On motion for rehearing, Hernandez objected to the court's failure to address the issue of whether he had been deprived of his Sixth Amendment right to counsel, although it arose from the same conduct complained of in his Fifth Amendment claim based on Estelle v. Smith. The court of criminal appeals denied rehearing without comment. The United States Supreme Court denied Hernandez's petition for a writ of certiorari on June 3, 1991. Hernandez v. Texas, 500 U.S. 960 (1991).

III.

A.

After unsuccessfully seeking a writ of habeas corpus in the Texas state courts, Hernandez filed the instant petition for federal habeas relief in the United States District for the Western District of Texas. Because Hernandez filed his petition on April 16, 1997, his case is governed by the habeas statute as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Lindh v. Murphy, 521 U.S. 320, 326-27 (1997). Section 2254 of the habeas statute, in pertinent part, now provides:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was

37

adjudicated on the merits in State court proceedings unless the adjudication of the claim–

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.

28 U.S.C. § 2254(d)(1) (1994 & Supp. 2000).

A state prisoner may obtain federal habeas relief with respect to a claim adjudicated on the merits in two categories of cases defined by subsection (d)(1): cases in which "the relevant state-court decision was either (1) contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States, or (2) involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States." Williams v. Taylor, 529 U.S. 362, 404-05 (2000) (O'Connor, J., delivering the opinion of the Court with respect to Part II (except as to the footnote)).

A state-court decision will be contrary to the Supreme Court's clearly established precedent if the state court applies a rule that contradicts the governing law set forth in the Supreme Court's cases. Id. at 405. Also, a state-court decision will be contrary to the Court's clearly established precedent if the state court "confronts a set of facts that are materially indistinguishable from a decision of th[e] Court and nevertheless arrives at a result different from [the Court's] precedent." Id. "Accordingly, in either of these two scenarios, a federal court will be unconstrained by § 2254(d)(1) because the state-court decision falls within that provision's 'contrary to'

clause." Id. at 406.

In general, a state-court decision involves an unreasonable application of the Court's precedent if the state court "identifies the correct governing legal rule from the [Supreme Court's] cases but unreasonably applies it to the facts of the particular state prisoner's case." Id. at 407. The majority correctly identifies this standard, but neglected to note that a state-court decision also involves an unreasonable application of Supreme Court precedent if the state court either unreasonably extends a legal principle from that precedent to a context where it should not apply or unreasonably refuses to extend that principle to a context where it should apply. Id.

> [A] federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established

federal law was objectively unreasonable. The federal habeas court should not transform the inquiry into a subjective one by resting its determination instead on the simple fact that at least one of the Nation's jurists has applied the relevant federal law in the same manner the state court did in the habeas petitioner's case.

Id. at 409-10. The Court disapproved the "all reasonable jurists" standard as misleading federal habeas courts into a subjective inquiry. Id. at 410. "Under § 2254(d)(1)'s 'unreasonable application' clause . . . a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411.

39

"[C]learly established Federal law, as determined by the Supreme Court of the United States [] refers to the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision." Id. at 412. Thus, the source of clearly established law is restricted by section 2254(d)(1) to the Supreme Court's jurisprudence. Id.

The majority's recitation of the Williams standard of review is incomplete, in that it does not fully examine the meaning of the "unreasonable application" prong of section 2254(d)(1), nor does it emphasize the statute's explicit instruction that the law to be applied to habeas petitioners' claims be limited to clearly established Supreme Court precedent. Moreover, after reciting the incomplete passages from Williams prior to analyzing Hernandez's claims, the majority fails in the body of its analysis of those claims to incorporate the Williams standard

of review and examine its interplay with the particular facts and proceedings here.

B.

1.

In his first claim, Hernandez contends that he was denied his constitutionally guaranteed Sixth Amendment right to counsel because (1) the state court subjected him to a custodial examination by a state psychiatrist, without advance notice to his defense counsel of the time, place, scope, or nature of the examination; (2) the state psychiatrist concluded from the examination that Hernandez had an antisocial personality disorder and probably would commit crimes of violence and be a continuing threat to society; and (3) the prosecution elicited testimony from the psychiatrist at the capital penalty hearing that he (a) had examined Hernandez prior to

40

trial, (b) had diagnosed Hernandez as having an untreatable antisocial personality disorder, and (c) was of the opinion that Hernandez, or a sociopath who had committed the crimes ascribable to Hernandez, probably would commit crimes of violence and be a continuing threat to society.

The threshold question under the AEDPA is whether Hernandez seeks to apply a rule of law that was clearly established at the time his state-court conviction became final on June 3, 1991. That question is easily answered because the merits of his claim are squarely governed by the Supreme Court's holdings in Estelle v. Smith, 451 U.S. 454 (1981); Satterwhite, supra; and Powell v. Texas, 492 U.S. 680 (1989). The majority completely and erroneously ignores these controlling

Supreme Court precedents.[18]

The Court held in Estelle v. Smith that a formally charged capital defendant's Sixth Amendment right to counsel precludes the

---

[18] In limiting its legal focus regarding Hernandez's Sixth Amendment claim to White v. Estelle, 720 F.2d 415 (5th Cir. 1983), the majority's analysis of that claim is flawed on several levels. First, we are mandated by the AEDPA and by the Supreme Court in Williams to restrict our analysis of habeas petitioners' legal claims to the application of clearly established federal law as established in Supreme Court precedent, not circuit court precedent. Second, Estelle v. Smith has been extended and clarified by the intervening precedent of Satterwhite and Powell in 1988 and 1989, respectively, as I discuss infra, such that the majority's analysis of the 1983 decision of White v. Estelle is largely irrelevant. The majority, indeed, does not even mention Powell or Satterwhite in its analysis. Third, Hernandez does not rely exclusively on White for the main thrust of his argument, citing it only twice for the proposition that a thinly veiled hypothetical presentation of the future dangerousness issue will not suffice to remove the State from the strictures of Estelle v. Smith. Hernandez, indeed, argues much more extensively that Powell and Satterwhite control the issue of whether his Sixth Amendment rights were violated. Accordingly, the majority's methods in bringing up White are at best questionable. It only sets up White as a strawman to tear down in an effort to further confuse and avoid the legal issues presented by Estelle v. Smith, Satterwhite, and Powell.

41

State from subjecting him to a psychiatric examination yielding evidence of his future dangerousness without first notifying defense counsel that the psychiatric examination will encompass the issue of their client's future dangerousness. See Powell, 492 U.S. at 681 (citing Estelle v. Smith, 451 U.S. at 461-69). The Court has consistently recognized that, for a capital defendant, whether to submit to a psychiatric examination encompassing the issue of his future dangerousness "is 'literally a life or death matter' which the defendant should not be required to face without the 'guiding hand of counsel.'" Id. (quoting Smith v. Estelle, 602 F.2d 694, 708 (5th Cir. 1979); Powell v. Alabama, 287 U.S. 45, 69 (1932)) (citing Satterwhite, 486 U.S. at 254). Consequently, when the Sixth Amendment notice requirement set out in Estelle v. Smith was not met, the Court held that "the death penalty was improperly imposed because the psychiatric examination on which [the psychiatrist] testified at the penalty phase proceeded in violation of the [defendant's] Sixth Amendment right to the assistance of counsel." 451 U.S. at 471; see also Powell, 492 U.S. at 686; Satterwhite, 486 U.S. at 255-56.

The rule set forth in the Estelle v. Smith line of Supreme Court cases is "clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Because that clear establishment occurred before Hernandez's state-court conviction became final, the Court's precedent "dictated" that the Texas Court of Criminal Appeals apply those holdings at the time that court entertained Hernandez's Sixth Amendment right to counsel habeas claim. Williams, 529 U.S. at 391 (citing Teague v. Lane, 489 U.S. 288, 301 (1989)). Hernandez is therefore entitled to relief if the decision of the Texas Court of

42

Criminal Appeals rejecting his Sixth Amendment habeas claim was either "contrary to, or involved an unreasonable application of," that established law. It was both.

2.

In the state habeas proceedings, the trial court in effect suggested, without definitely recommending, that the court of criminal appeals could, if it had not already implicitly done so, reject Hernandez's Sixth Amendment right to counsel claim for the same reasons that it had rejected his Fifth Amendment claim on direct appeal.

Essentially, the state habeas trial court found and concluded that (1) "[p]etitioner's claim of error under Estelle v. Smith, 451 U.S. 454, was raised and rejected on direct appeal" (citing Hernandez v. State, 805 S.W.2d at 411-12); (2) "[t]he Trial Court . . . must defer any ruling with regard to [the Sixth Amendment right to counsel] issue to the Texas Court of Criminal Appeals, since the related issues with regard to Dr. Sparks'[s] evaluation of Petitioner were raised and rejected on direct appeal"; (3) "the question is presented as to whether or not the decisions of Estelle v. Smith . . . and Powell v. Texas . . . require the presence of counsel where the state's mental health expert's testimony is 'not a direct assertion of an expert's opinion concerning future dangerousness,' but rather, some other form of mental health diagnosis harmful to the defendant's case"; and (4) it could "find no case law authority indicating that there are Fifth or Sixth Amendment rights attaching to psychiatric opinions not directly going to the Texas 'special issues,' but, the trial court believes that the Texas Court of Criminal Appeals should review this issue closely to determine if there is such a requirement."

43

On appeal from the state habeas trial court's findings and conclusions, including those concerning Hernandez's Sixth Amendment claim, the Texas Court of Criminal Appeals issued a per curiam order stating that the findings and conclusions of the trial court "are supported by the record and upon such basis the relief sought is denied." Consequently, the Texas Court of Criminal Appeals's decision rejecting Hernandez's Sixth Amendment right to counsel habeas claim on appeal adopted the findings and conclusions of the Texas habeas trial court, viz., that the court of criminal appeals's rejection of Hernandez's Sixth Amendment right to counsel claim could be justified as an application or extension of its holding in rejecting Hernandez's Fifth Amendment right against self-incrimination claim on direct appeal. See Hernandez v. State, 805 S.W.2d 409 (Tex. Crim. App. 1990) (en banc) (direct appeal). Therefore,

we must refer to the court of criminal appeals's decision of Hernandez's direct appeal to identify the rule of law that the court of criminal appeals, by adopting the state habeas trial court's findings and conclusions, applied or extended to reject Hernandez's Sixth Amendment right to counsel habeas claim.

3.

On direct appeal, the Texas Court of Criminal Appeals had rejected Hernandez's Fifth Amendment right against self-incrimination claim in a full opinion that was silent with respect to his Sixth Amendment right to counsel claim. Hernandez v. State, 805 S.W.2d 409 (Tex. Crim. App. 1990) (en banc) (direct appeal). The court of criminal appeals formulated the rule of law it applied in reaching the conclusion that Hernandez's Fifth Amendment right had not been violated as

44

follows.

First, the Texas Court of Criminal Appeals observed that the Supreme Court in Estelle v. Smith noted that some courts had held that the Fifth Amendment does not prevent a defendant who offers psychiatric testimony in an insanity defense from being required to submit to a sanity examination by the prosecution's psychiatrist, 805 S.W.2d at 412 (citing Estelle v. Smith, 451 U.S. at 465); and further noted that the court of appeals in Estelle v. Smith had left open the possibility of a similar requirement for a defendant who wishes to use psychiatric evidence defensively on the issue of future dangerousness, id. (citing Estelle v. Smith, 451 U.S. at 466 n.10, in turn citing Smith v. Estelle, 602 F.2d at 705). Second, the Texas Court of Criminal Appeals noted that the Supreme Court in Buchanan v. Kentucky, 483 U.S. 402 (1987), had held that the State did not violate the Fifth Amendment by introducing excerpts of a psychiatric evaluation of the defendant to rebut the defendant's affirmative "mental status" defense, because defense counsel had joined in the State's motion to obtain the evaluation and had introduced evidence from it in support of the affirmative defense. Id. (citing Buchanan, 483 U.S. at 423). Third, the Texas Court of Criminal Appeals inferred from the language in Buchanan and Smith that, "[b]y introducing [Hernandez]'s TDC psychiatric records and soliciting Dr. Sparks'[s] opinion concerning those records, appellant 'opened the door' to the State's use of the results of his competency exam for rebuttal purposes." Id. Fourth, the Texas Court of Criminal Appeals concluded that Dr. Sparks's testimony based on his psychiatric examination was relevant to, i.e. tended to prove, Hernandez's future dangerousness, but that the trial court had prevented Dr. Sparks from expressing an expert opinion directly or specifically upon

45

Hernandez's future dangerousness. Fifth, based on all of these circumstances, the Texas Court of Criminal Appeals concluded that Hernandez's Fifth Amendment right against self-incrimination had not been violated.

4.

The facts and legal issues of Powell and the present case are very similar. Powell, a capital defendant, was subjected to court-ordered examinations by a court-designated psychiatrist and a psychologist chosen by that doctor, to determine competency to stand trial and sanity at the time of the offense. Powell, 492 U.S. at 681. Powell and his counsel were not notified that he would be examined on the issue of future dangerousness. Id. at 682. The State's psychiatrist and psychologist testified at the penalty phase that Powell would commit future acts of violence that would constitute a continuing threat to society. Id. In affirming his death sentence, the Texas Court of Criminal Appeals held that Powell's Fifth and Sixth Amendment rights were not violated because he waived those rights by introducing psychiatric testimony in support of his insanity defense. Id. at 682-83 (citing Powell v. State, 767 S.W.2d 759, 762 (Tex. Crim. App. 1989) (en banc)). The Texas Court of Criminal Appeals held that Powell not only waived the right to object to the State's use of the testimony of the state psychiatrist and psychologist to rebut his insanity defense, but that he also waived the right to object to the State's use of this testimony to satisfy its burden at sentencing of proving the separate issue of future dangerousness. Id. (citing Powell v. State, 742 S.W.2d 353, 357-58 (Tex. Crim. App. 1987) (en banc)). The Supreme Court reversed the judgment of the Texas Court of Criminal Appeals because the

46

state court had "conflated the Fifth and Sixth Amendment analyses, and provided no support for its conclusion that petitioner waived his Sixth Amendment right[.]" Id. at 683.

The Supreme Court in Powell emphasized the important distinction between the appropriate Fifth and Sixth Amendment analyses. The Court noted its dictum in Estelle v. Smith that a defendant could waive his Fifth Amendment right by asserting the insanity defense "and introduc[ing] supporting psychiatric testimony, [because] his silence may deprive the State of the only effective means it has of controverting his proof on an issue that he has injected into the case," 451 U.S. at 465, and its holding in Buchanan that a defendant whose defense counsel joined in a request for a psychiatric evaluation and then introduced evidence from it to prove a mental-status defense waived the right to

raise a Fifth Amendment challenge to the prosecution's use of other evidence from the same evaluation to rebut the defense. 483 U.S. at 422-23.

But, as the Powell Court explained, the Sixth Amendment right to counsel, once it has attached, unlike the Fifth Amendment Miranda right, cannot be waived by a capital defendant acting on his own without the guidance of counsel:

> [T]he waiver discussions contained in Smith and Buchanan deal solely with the Fifth Amendment right against self-incrimination. Indeed, both decisions separately discuss the Fifth and Sixth Amendment issues so as not to confuse the distinct analyses that apply. No mention of waiver is contained in the portion of either opinion discussing the Sixth Amendment right. This is for good

47

reason. While it may be unfair to the state to permit a defendant to use psychiatric testimony without allowing the state a means to rebut that testimony, it certainly is not unfair to require the state to provide counsel with notice before examining the defendant concerning future dangerousness. Thus, if a defendant were to surprise the prosecution on the eve of trial by raising an insanity defense to be supported by psychiatric testimony, the court might be justified in ordering a continuance and directing that the defendant submit to examination by a state-appointed psychiatrist. There would be no justification, however, for also directing that defense counsel receive no notice of this examination.

The distinction between the appropriate Fifth and Sixth Amendment analyses was recognized in the Buchanan decision. In that case, the Court held that the defendant waived his Fifth Amendment privilege by raising a mental-status defense. This conclusion, however, did not suffice to resolve the defendant's separate Sixth Amendment claim. Thus, in a separate section of the opinion the Court went on to address the Sixth Amendment issue,

concluding that on the facts of that case counsel knew what the scope of the examination would be before it took place. Indeed, defense counsel himself requested the psychiatric examination at issue in Buchanan. In contrast, in this case counsel did not know that the [] examinations [by the state psychiatrist and psychologist] would involve the issue of future dangerousness.

Powell, 492 U.S. at 684-85 (citations omitted).

Consequently, contrary to the majority's erroneous reading and misplaced reliance, Buchanan is distinguishable and has no effect upon the Supreme Court's Sixth Amendment holdings in Powell, Estelle v. Smith, and Satterwhite that govern Hernandez's Sixth Amendment right to counsel claim. Under those cases, if the State, although exercising due diligence, had been genuinely surprised by the introduction of Hernandez's medical records as evidence of his chronic paranoid schizophrenia, the trial court might have been justified in ordering a continuance and directing Hernandez to submit to examination by a state-appointed psychiatrist. Even in such a case, however, the State would be required by the Sixth Amendment right to counsel to give Hernandez's counsel notice of the examination and its scope and an adequate opportunity to confer with and advise Hernandez prior to the examination. The Supreme Court's cases emphatically do not permit the State to introduce evidence of future dangerousness derived from an unconstitutional examination of a capital

49

defendant through a violation of his Sixth Amendment right to counsel, even when the State has been diligent and can genuinely claim surprise.

Consequently, under the actual circumstances of Hernandez's case, the denial by the Texas Court of Criminal Appeals of Hernandez's Sixth Amendment claim was markedly contrary to and in conflict with the Supreme Court's decisions in Powell, Estelle v. Smith, and Satterwhite. The majority, in its exclusive reliance upon Buchanan, repeats this error. The State in Hernandez's case did not and could not claim surprise or justifiably ask for a penalty phase examination of the defendant. Both the State and Dr. Sparks were placed on notice and had actual knowledge of Hernandez's prior diagnoses of and treatment for chronic paranoid schizophrenia by state doctors at the TDC and the county psychiatrist, Dr. Cameron. In their pretrial

motion for funds to employ a defense psychiatric expert, defense counsel notified the court and the State of Hernandez's mental illness and prior psychiatric treatment in the TDC and the military. Dr. Sparks admitted in his penalty phase testimony that he was aware of the TDC psychiatric medical records prior to his pretrial examination of Hernandez. Dr. Sparks revealed his knowledge of Dr. Cameron's prior diagnosis of Hernandez's paranoid schizophrenia in his pretrial report and competency hearing testimony. Furthermore, Dr. Sparks was aware of the facts of the case involving Hernandez's auditory hallucinations and bizarre conduct indicating active paranoid schizophrenia before he began his testimony. And later in his testimony Dr. Sparks acknowledged that in his field of expertise Hernandez's behavior was consistent with a classic manifestation of paranoid schizophrenia.

### 5.

The adjudication by the court of criminal appeals in the present case repeated the error it had made in Powell of conflating the Fifth and Sixth Amendment analyses, resulting in a decision that was contrary to, and involved an unreasonable application of, the Supreme Court's clearly established precedents.

The Supreme Court in Estelle v. Smith, Powell, and Satterwhite clearly established federal law that (1) once a capital defendant is formally charged, the Sixth Amendment right to counsel precludes the State from subjecting him to a psychiatric examination yielding evidence of his future dangerousness without first notifying defense counsel that the psychiatric examination will encompass that issue; and (2) when the psychiatric examination proceeds in violation of that right and the State's expert presents evidence of the defendant's future dangerousness at the penalty phase based on the examination, the resulting death penalty is improperly imposed and must be reversed.

The habeas decision by the Texas Court of Criminal Appeals was contrary to the Estelle v. Smith, Powell, and Satterwhite definition of the Sixth Amendment right to counsel, to the extent that it held that language in Buchanan and Estelle v. Smith created an exception to the rule of the Supreme Court cases, viz., that when the defendant introduces psychiatric evidence at the penalty phase and uses it to cross-examine the State's expert, he "opens the door" to the State's use of evidence of future dangerousness of the defendant that had been obtained in violation of his Sixth Amendment right to counsel, so long as the state expert does not express any opinion directly upon the defendant's future dangerousness based on the examination of the defendant.

51

The Sixth Amendment exception or waiver rule applied by the Texas Court of Criminal Appeals in deciding Hernandez's habeas appeal conflicts with the Supreme Court's decision in Buchanan and dictum in Estelle v. Smith, as well as the Sixth Amendment right to counsel as defined by the Court's holdings in Estelle v. Smith, Powell, and Satterwhite.

First, as the Court made clear in Powell, those "waiver discussions contained in Smith and Buchanan deal solely with the Fifth Amendment right against self-incrimination. . . . No mention of waiver is contained in the portion of either opinion discussing the Sixth Amendment right." 492 U.S. at 684-85. Second, unlike the defendants in Estelle v. Smith, Powell, Satterwhite, and this case, the defendant in Buchanan was not deprived of his Sixth Amendment right to counsel because his defense counsel joined in requesting the psychiatric evaluation and

presumably consulted with the defendant about the nature and scope of the proceeding beforehand. Third, the scope of the pretrial examination in the non-capital Buchanan case could not have encompassed the issue of future dangerousness, which the Court had been concerned with in the Estelle v. Smith line of cases as a literal life-or-death issue, and the Buchanan decision therefore cannot be read reasonably as modifying the right to be informed of the scope of a pretrial examination that would encompass the death penalty future dangerousness issue. Fourth, the Supreme Court has never held or suggested that a capital defendant who introduces mitigating psychiatric evidence at the penalty phase waives his right to counsel at any critical stage of the prosecution or "opens the door" to the State's introduction of the fruits of a violation of his Sixth Amendment right to counsel. Fifth, the Supreme Court has never held or suggested that a state can circumvent the Sixth

52

Amendment holdings in Estelle v. Smith, Powell, and Satterwhite by simply having its expert avoid expressing a direct opinion upon the defendant's future dangerousness while giving testimony that is indirectly, but highly, probative of the defendant's future dangerousness.

Moreover, the Court in Powell concluded that "[n]othing in Smith, or any other decision of this Court, suggests that a defendant opens the door to the admission of psychiatric evidence on future dangerousness by raising an insanity defense at the guilt stage of trial." 492 U.S. at 685 n.3. The Court suggested, without holding, that a capital defendant who introduces future dangerousness evidence defensively in the penalty phase may be required to submit to examination by a state-appointed psychiatrist. Even in such a case, however, the Court's opinions indicate that the defendant does not waive his Sixth Amendment right to counsel that requires the State to afford advance notice to defense counsel of the examination and its scope and an opportunity for a pre-examination consultation between the defendant and his counsel. Consequently, the Court's opinions clearly indicate that a capital defendant who introduces such evidence at the penalty phase does not waive rights and remedies with respect to the State's introduction of evidence obtained by a prior breach of his Sixth Amendment right to counsel. See Powell, 492 U.S. at 685 & n.3, 686; Satterwhite, 486 U.S. at 255; Estelle v. Smith, 451 U.S. at 465, 466 n.10.

The Texas Court of Criminal Appeals's decision in Hernandez's state habeas appeal also involved an unreasonable application of the United States Supreme Court cases of Buchanan and Estelle v. Smith, by unreasonably formulating and extending legal principles from those precedents to a new

53

context where they should not apply. The Court in Buchanan held that, when defense counsel joins the State in submitting the defendant to a psychiatric evaluation, after consulting with the defendant about its nature and scope, and then introduces psychiatric evidence in a non-capital guilt trial in support of an affirmative mental status defense, the prosecution's introduction of excerpts from the report of the pretrial psychiatric evaluator in rebuttal does not constitute a violation of the Fifth or Sixth Amendments. The Buchanan precedent cannot be reasonably extended to Hernandez's capital case, as the Buchanan Court itself made clear by contrasting it with Estelle v. Smith:

> [I]t was unclear whether Smith's counsel had even been informed about the psychiatric examination. . . . [I]n any event, defense counsel

was not aware that the examination would include an inquiry into Smith's future dangerousness. Thus, in our view, Smith had not received the opportunity to discuss with his counsel the examination or its scope. Here, in contrast, petitioner's counsel himself requested the psychiatric evaluation . . . . It can be assumed . . . that defense counsel consulted with petitioner about the nature of this examination.

Buchanan, 483 U.S. at 424. Only by unreasonably ignoring the same crucial dissonance between the Fifth Amendment decision in Buchanan and Hernandez's Sixth Amendment claim could the Texas Court of Criminal Appeals purport to shoehorn Hernandez's case into the narrow Buchanan holding. For the same reason, and another, Estelle v. Smith does not reasonably support the application by the Texas Court of Criminal

54

Appeals of a "door opening" exception or waiver rule to reject Hernandez's Sixth Amendment claim. Not only was the Smith language relied on by the Texas habeas trial and appellate courts addressed to the waiver of the Fifth Amendment right against self-incrimination, rather than the more indispensable Sixth Amendment right to counsel, but it was also dicta, as opposed to the holding, of the Supreme Court's decision, and therefore not part of the "clearly established law" under section 2254(d)(1). Williams, 529 U.S. at 412.

### C.

#### 1.

Hernandez also claims that he was sentenced to death in violation of the Eighth Amendment because the jury's instructions did not allow it to give full consideration and effect to the mitigating evidence of his abused childhood. The threshold question under the AEDPA again is whether Hernandez seeks to apply a rule of law that was clearly established at the time his conviction became final on June 3, 1991. Because the merits of Hernandez's Eighth Amendment claim are directly governed by the Supreme Court's decision in Penry v. Lynaugh, 492 U.S. 302 (1989) the answer to that question is yes. Therefore, the majority opinion defaults upon its duty to apply the clearly established Federal law, as determined by the Supreme Court's decision in Penry, by applying its own interpretation of federal law and by resolving Hernandez's Eighth Amendment claim in a manner opposite to the resolution of Penry's Eighth Amendment claim by the Supreme Court.

#### 2.

In Penry v. Lynaugh, the Supreme Court

55

held that (1) "at the time Penry's conviction became final, it was clear from [Lockett v.Ohio, 438 U.S. 586 (1978)] and [Eddings v. Oklahoma, 455 U.S. 104 (1982)] that a State could not, consistent with the Eighth and Fourteenth Amendments, prevent the sentencer from considering and giving effect to evidence relevant to the defendant's background or character or to the circumstances of the offense that mitigate against imposing the death penalty[,]" 492 U.S. at 318; (2) "[t]he rule Penry [sought]—that when such mitigating evidence [of his mental retardation and abused childhood] is presented, Texas juries must . . . be given jury instructions that make it possible for them to give effect to that mitigating evidence in determining whether the death penalty should be imposed—is not a 'new rule' under Teague because it is dictated by Eddings and Lockett[,]" id. at 318-19; (3) "[u]nderlying Lockett and Eddings is the principle that punishment should be directly related to the personal culpability of the criminal defendant[,]" id. at 319; (4) "it is not enough simply to allow the defendant to present mitigating evidence to the sentencer[–][t]he sentencer must also be able to consider and give effect to that evidence in imposing sentence[,]" id.; (5) "[i]n order to ensure reliability in the determination that death is the appropriate punishment in a specific case, the jury must be able to consider and give effect to any mitigating evidence relevant to a defendant's background and character or the circumstances of the crime[,]" id. at 328; and (6) therefore, "in the absence of instructions informing the jury that it could consider and give effect to the mitigating evidence of Penry's mental retardation and abused [childhood] background by declining to impose the death penalty, . . . the jury was not provided with a vehicle for expressing its reasoned moral response to that evidence in

56

rendering its sentencing decision[,]" id. at 328. (Internal quotations and citations omitted).

Thus, the Supreme Court in Penry agreed with Penry's argument "that his mitigating evidence of mental retardation and childhood abuse has relevance to his moral culpability beyond the scope of the special issues, and that the jury was unable to express its reasoned moral response to that evidence in determining whether death was the appropriate punishment." Id. at 322. The Court explained in detail why it rejected the State's contrary argument that the jury was able to consider and give effect to all of Penry's mitigating evidence in answering the three special issues. Id.

The first special issue, which asked whether the defendant acted "deliberately and with the reasonable expectation that the death of the deceased . . . would result," impermissibly limited the jury's function because the term "deliberately" had not been defined by the Texas Legislature, the Texas Court of Criminal Appeals, or the trial court's instructions. Id. at 322. Assuming that the jurors "understood 'deliberately' to mean something more than . . . 'intentionally' committing murder, those jurors may still have been unable to give effect to Penry's mitigating evidence in answering the first special issue." Id. The Court concluded that the jury could not give full effect to Penry's evidence under the first special issue because "deliberately" was not defined "in a way that would clearly direct the jury to consider fully Penry's mitigating evidence as it bears on his personal culpability." Id. at 323. Thus, the evidence had relevance beyond the scope of the first special issue. Id. at 322. The Court made it clear that both Penry's mental retardation and his history of abused childhood constituted relevant mitigating evidence: "Because Penry was mentally retarded . . . and

57

thus less able than a normal adult to control his impulses or to evaluate the consequences of his conduct, and because of his history of childhood abuse, that same juror [who concluded that Penry acted 'deliberately,'] could also conclude that Penry was less morally culpable than defendants who have no such excuse[.]" Id. Consequently, the Court concluded, unless there are "jury instructions defining 'deliberately' in a way that would clearly direct the jury to consider fully Penry's mitigating evidence as it bears on his personal culpability, we cannot be sure that the jury was able to give effect to the mitigating evidence of Penry's mental retardation and history of abuse in answering the first special issue." Id. at 323. "Thus, we cannot be sure that the jury's answer to the first special issue reflected a reasoned moral response to Penry's mitigating evidence." Id. (internal quotation omitted).

The second special issue, which asked "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society," permitted the jury to consider and give effect to Penry's mental retardation and childhood abuse as "relevant only as an aggravating factor[.]" Id. But the second special issue was not inadequate simply because it only gave effect to Penry's evidence as an aggravating factor; it was dysfunctional because it did not allow the jury to give full effect to Penry's mitigating evidence. Id. at 323. "The second special issue, therefore, did not provide a vehicle for the jury to give mitigative effect to Penry's evidence of mental retardation and childhood abuse." Id. at 324.

The third special issue, which asked "whether the conduct of the defendant in killing the deceased was unreasonable in response to provocation, if any, by the deceased," likewise did not provide a vehicle for the jury to fully consider and give effect to

58

the mitigation evidence by sparing his life because of his diminished personal culpability. "Thus, a juror who believed Penry lacked the moral culpability to be sentenced to death could not express that view in answering the third special issue if she also concluded that Penry's action was not a reasonable response to provocation." Id. at 324-25.

As the justices who dissented in part in Penry acknowledged, the Penry majority held "that the constitutionality [of a death sentence under the Texas special issues] turns on whether the questions allow mitigating factors not only to be considered (and, of course, given effect in answering the questions), but also to be given effect in all possible ways, including ways that the questions do not permit." Id. at 355 (Scalia, J., dissenting in part and concurring in part). Or, as the majority concluded, "in the absence of instructions informing the jury

that it could consider and give effect to the mitigating evidence of Penry's mental retardation and abused background by declining to impose the death penalty, . . . the jury was not provided with a vehicle for expressing its 'reasoned moral response' to that evidence in rendering its sentence." Id. at 328.

The Court in Penry expressly rejected the State's argument that any defect in the jury instructions should be disregarded because Penry's defense counsel was able to argue that jurors who believed that Penry, because of his mitigating evidence of mental retardation and childhood abuse, did not deserve a death sentence should vote "no" on one of the special issues regardless of the State's proof on that the answer. Id. at 325. The Court pointed out that "the prosecution countered by stressing that the jurors had taken an oath to follow the law, and that they must follow the instruction they were given in answering the

59

special issues." Id. "In light of the prosecutor's argument, and in the absence of appropriate jury instructions," the Court concluded, "a reasonable juror could well have believed that there was no vehicle for expressing the view that Penry did not deserve to be sentenced to death based upon his mitigating evidence." Id. at 326.

Finally, the Court in Penry rejected the State's argument that "to instruct the jury that it could render a discretionary grant of mercy, or say 'no' to the death penalty, based on Penry's mitigating evidence, would be to return to the sort of unbridled discretion that led to Furman v. Georgia." Id. (citing 408 U.S. 238 (1972)). "[A]s we made clear in [Gregg v. Georgia, 428 U.S. 153, 197-99 (1976)], so long as the class of murders subject to capital punishment is narrowed, there is no constitutional infirmity in a procedure that allows a jury to recommend mercy based on the mitigating evidence introduced by a defendant." Id. at 327 (also quoting Justice White's opinion concurring in the judgment in Gregg, 428 U.S. at 222 ("The Georgia legislature has plainly made an effort to guide the jury in the exercise of its discretion, while at the same time permitting the jury to dispense mercy on the basis of factors too intangible to write into a statute, and I cannot accept the naked assertion that the effort is bound to fail.")). Further, the Court reaffirmed and quoted its opinion in McCleskey v. Kemp: "'In contrast to the carefully defined standards that must narrow a sentencer's discretion to impose the death sentence, the Constitution limits a State's ability to narrow a sentencer's discretion to consider relevant evidence that might cause it to decline to impose the death sentence.'" Id. (quoting 481 U.S. 279, 304 (1987)). Consequently, the Court concluded:

Indeed, it is precisely because the

60

punishment should be directly related to the personal culpability of the defendant that the jury must be allowed to consider and give effect to mitigating evidence relevant to a defendant's character or record or the circumstances of the offense. . . . In order to ensure reliability in the determination that death is the appropriate punishment in a specific case, the jury must be able to consider and give effect to any mitigating evidence relevant to a defendant's background and character or the circumstances of the

crime.

Id. at 327-28 (internal citations and quotations omitted).

3.

Hernandez first raised his Penry claim in his application for state post-conviction relief. As I observed, supra, the Texas Court of Criminal Appeals denied Hernandez's application for post-conviction relief in a brief per curiam order stating, in pertinent part, "The trial court has entered findings of fact and conclusions of law. We have examined the record. The findings and conclusions are supported by the record and upon such basis the relief sought is denied." Therefore, we should consider the findings and conclusions of the state habeas trial court to determine whether the denial of relief by the court of criminal appeals was contrary to or an

61

unreasonable application of clearly established Supreme Court jurisprudence.

In connection with Hernandez's Eighth Amendment Penry claim, the state habeas trial court, in the 207th District Court of Comal County, Texas, found the following facts:

 Judy Mendiola, a San Antonio Park Ranger, and cousin of Petitioner's, testified that when she was a young child, she and Petitioner had lived together for a period of approximately 10 years, and that during that time, Petitioner's father was an alcoholic, who beat Petitioner's mother, which resulted in Petitioner's mother causing physical abuse to Petitioner, (2513 - 2516);

 Witness Mendiola indicated that after Petitioner's release from prison, she asked him to seek "psychiatric help" and also indicated that Petitioner had only received a fifth or sixth grade education (2518), which was corroborated by school records indicating that Petitioner may have received education through the seventh grade (2519 - 2522)[.]

(Internal enumeration omitted; record citations included).

In regard to Hernandez's Penry claim, the state habeas trial court adopted the following pertinent conclusions of law:

 This Court finds that there is some evidence before the jury of child abuse perpetrated against Petitioner over a 10 year period. See testimony of Defense witness Mendiola;

 * * * With regard to the Court of Criminal Appeals' interpretation of the

62

Penry decision, it appears that, in the past, the Court has generally required a showing of mental retardation before holding that a defendant is entitled to a Penry instruction, see Ramirez v. State, 815 S.W.2d 636; Ex Parte McGee, 817 S.W.2d 77; Rios v. State, 846 S.W.2d 310; McPherson v. State, 851 S.W.2d 846; Ex Parte Richard, 842 S.W.2d 279; Ex Parte Goodman, 816 S.W.2d 383; however, the Court has also granted relief under the Penry doctrine where there is cumulative evidence of "troubled childhood, abnormal mental and emotional condition, and sexual aberrations." See Bribble v. State, 808 S.W.2d 65;

The Penry decision is still valid law. See Johnson v. Texas, [509 U.S. 350 (1993)];

The United States Supreme Court granted certiorari, vacated the Court of Criminal Appeals judgments, and remanded to the Texas Court of Criminal Appeals at least five cases for reconsideration in light of Johnson v. Texas, and those cases are, presumably, still pending before the Texas Court of Criminal Appeals;

Since the trial court has found "some evidence" of child abuse, and "some evidence" that Petitioner was a long time sufferer of "paranoid schizophrenia," to which he could have

been suffering at the time of the commission of this crime, then the trial court must defer any further conclusions of law to the ultimate judgment of the Texas Court of Criminal Appeals, and

However, the trial court does recommend that the Texas Court of Criminal Appeals "file and set" this case for submission before the Court for further briefs and arguments with regard to the merits of Petitioner's Penry claim as raised herein under the evidence.

(Paragraph enumeration and emphases omitted).

On Hernandez's habeas appeal, however, the court of criminal appeals disregarded the state habeas trial court's recommendations that it "file and set" the case for submission on briefs and arguments regarding Hernandez's Penry claim. Instead, as I have noted, the court of criminal appeals simply denied the relief sought based on the findings and conclusions of the trial court, after determining that they were supported by the record. Therefore, we should review the habeas decision of the court of criminal appeals as adopting and incorporating the state habeas trial court's findings and conclusions.

4.

The state habeas trial court's findings and conclusions, upon which the state criminal court of appeals based its per curiam denial of habeas relief to Hernandez, were ambivalent and inconclusive. The state habeas trial court did not, as the majority mistakenly asserts, recommend a denial of relief. The state habeas trial court (1) found that "there is some

64

evidence before the jury of child abuse perpetrated against Petitioner over a 10 year period[]"; (2) concluded that "the Penry decision is still valid law[]"; (3) concluded that the state court of criminal appeals had "generally required a showing of mental retardation before . . . a defendant is entitled to a Penry instruction, . . . [but] has also granted relief under the Penry doctrine where there is cumulative evidence of 'troubled childhood, abnormal mental and emotional condition, and sexual aberrations[]'" (emphasis in original); and (4) concluded that, because it had found some evidence that Hernandez suffered from both an abused childhood and paranoid schizophrenia, "to which he could have been suffering at the time of the commission of this crime," it must defer any further conclusions of law to the ultimate judgment of the state court of criminal appeals.

As a consequence, the state court of criminal appeals's denial of Hernandez's Penry claim based on such ambivalent and indeterminate conclusions is both contrary to and an unreasonable application of Penry in several respects. The state-court decision was contrary to the Supreme Court's clearly established precedent because it may be read either as reaching a different result from that precedent after confronting a set of facts materially indistinguishable from the precedent's facts or as applying a rule that contradicts the governing law set forth in the Supreme Court's cases. On the other hand, the state-court decision may be interpreted as involving an unreasonable application of the Court's precedent because it either identified the correct governing legal rule from the Court's cases but unreasonably applied it to the facts of Hernandez's case or it unreasonably refused to extend the principle of Penry to a context where it should apply.

65

### a.

Hernandez's evidence of an abused childhood was materially indistinguishable from Penry's history of maltreatment. The Supreme Court concluded such a background of abused childhood was relevant mitigating evidence that the jury must be instructed it may fully consider and give effect to in deciding whether to impose a sentence less than death. Consequently, by denying Hernandez's claim, the decision by the Texas Court of Criminal Appeals was contrary to clearly established federal law as determined by the Supreme Court. Williams, 529 U.S. at 405 ("A state-court decision will also be contrary to this Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent.").

Hernandez was beaten regularly between the ages of three and thirteen. He received most of his continual beatings from his mother after she had been beaten by her alcoholic husband, Hernandez's father. On at least one occasion his mother had beaten him with a broom handle, breaking it over his head and leaving him lying on the floor. On at least one other occasion, Hernandez's father had joined his mother in beating him viciously with a belt and large belt buckle.

Penry's mother had frequently beaten him over the head with a belt when he was a child. He was also regularly locked in a bedroom without access to a toilet for long periods. He was in and out of state schools and hospitals, until his father removed him from state schools when he was twelve. Penry, 492 U.S. at 309.

Regarding the first special issue, in Hernandez's case, as in Penry, the jury was not provided with a definition of the term "deliberately" or given any instruction that

66

would indicate that the jury could regard Hernandez's history of abused childhood as evidence that might cause it to decline to impose the death sentence. Therefore, <u>Penry</u> dictates that, "[i]n the absence of jury instructions defining 'deliberately' in a way that would clearly direct the jury to consider fully [Hernandez's] mitigating evidence as it bears on his personal culpability, we cannot be sure that the jury was able to give effect to the mitigating evidence of [Hernandez's] . . . history of abuse in answering the first special issue." <u>Id.</u> at 323.

Also, as in <u>Penry</u>, Hernandez's mitigating evidence of childhood abuse was relevant to the second special issue only as an aggravating factor because it appears to increase the possibility of future behavioral problems and dangerousness. More importantly, however, the second special issue prevented the jury from giving full mitigative effect to the evidence of

Hernandez's abused childhood; even if the jury found that he did not deserve the death penalty because the effects of his maltreatment in early childhood reduced his personal culpability, the jury would still be bound to answer "yes" to the second special issue if it also found he would probably be dangerous and a threat to society.

Neither the first nor the second special issue, therefore, provided a vehicle for the jury to give mitigating effect to Hernandez's relevant mitigating evidence of childhood abuse. Because the third special issue, whether the defendant acted unreasonably in response to provocation, was not presented to the jury, the State does not contend that it provided a vehicle for the jury to give full mitigative effect to the evidence of Hernandez's abused childhood. Thus, the state court of criminal appeals in Hernandez was confronted by facts of abused childhood that were materially indistinguishable from

67

those upon which the Supreme Court reached a different result. Consequently, the denial by the Texas Court of Criminal Appeals of state habeas relief was contrary to clearly established Supreme Court precedent.

b.

Because the state habeas trial court, in its conclusions, referred to some of the decisions by the state court of criminal appeals as holding that a showing of mental retardation is prerequisite to a Penry instruction, it is arguable that the court of criminal appeals applied such a rule in denying Hernandez relief. If so, its decision was contrary to and an unreasonable application of the Supreme Court's clearly established precedent in Penry. T h e Penry Court agreed with Penry's argument that "his mitigating evidence of mental retardation and childhood abuse had relevance to his moral culpability beyond the scope of the special issues, and that the jury was unable to express its reasoned moral response to that evidence in determining whether death was the appropriate punishment." Id. at 322. The Penry Court throughout its opinion indicated that it considered Penry's abused childhood, as well as his mental retardation, to be independently relevant mitigating evidence that the jury should have been instructed that it could consider and give effect to in determining whether to impose the death penalty. Id. at 312 (listing as separate evidence of Penry's possible reduced personal culpability "his mental retardation, arrested emotional development, and abused background"); see also id. at 317 (approvingly quoting Lockett for the premise that a sentencer must "'not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record'")

68

(quoting 438 U.S. at 604) (emphasis added); id. at 318 (approvingly quoting Eddings that "'[j]ust as the State may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, as a matter of law, any relevant mitigating evidence.'") (quoting 455 U.S. at 113-14) (emphasis added); id. at 322 (holding that the jury must be able to give effect to "all" of the defendant's mitigating evidence). The Court did not hold or suggest that either the factor of mental retardation or childhood abuse by itself would fail to constitute relevant mitigating evidence that the jury must be able to consider and give effect to in deciding Penry's fate. Moreover, the Court repeatedly emphasized that "a sentencer may not be precluded from considering, and may not refuse to consider, any relevant mitigating evidence offered by the defendant as the basis for a sentence less than death[,]"

id. at 318 (emphasis added); and that "the jury must be able to consider and give effect to any mitigating evidence relevant to a defendant's background and character or the circumstances of the crime[,]" id. at 328 (emphasis added).

Penry constitutes "clearly established Federal law, as determined by the Supreme Court of the United States" that in the capital penalty phase the sentencer may not be precluded from considering, and may not refuse to consider, any constitutionally relevant mitigating evidence; that evidence of mental retardation or an abused childhood, individually or in combination, qualifies as constitutionally relevant mitigating evidence; and that when mitigating evidence of mental retardation or an abused childhood is presented, Texas juries must be given instructions that allow them to give effect to that mitigating evidence in determining whether to impose the death penalty. A state-

69

court decision will be contrary to <u>Penry</u> if it applies a rule that contradicts the Supreme Court's holding by requiring such instructions only in cases involving evidence of mental retardation.

c.

Finally, for the foregoing reasons, if the decision of the state court of criminal appeals is read as identifying the correct governing legal rule by adopting in isolation the state trial habeas court's conclusion that "[t]he <u>Penry</u> decision is still valid law," its decision amounts simply to an unreasonable application of <u>Penry</u> to the facts of Hernandez's case. Alternatively, for the same foregoing reasons, if the state-court decision is read as a refusal to extend the principle of <u>Penry</u> to Hernandez's case because it involves relevant mitigating evidence of an abused childhood, and not

evidence of mental retardation, it would constitute an unreasonable refusal to apply or extend that principle to a context where it should apply. In either case, the state-court decision would involve an unreasonable application of the clearly established law of <u>Penry</u>.

d.

The more recent Supreme Court cases, to the extent they are relevant, are not to the contrary. <u>See</u> <u>Graham v. Collins</u>, 506 U.S. 461 (1993), and <u>Johnson v. Texas</u>, 509 U.S. 350 (1993). Under the AEDPA, we are required to determine whether the decision of the Texas Court of Criminal Appeals is contrary to or an unreasonable application of clearly established Supreme Court precedent at the time Hernandez's conviction became final. Hernandez's conviction became final with the denial of a writ of certiorari by the Supreme

70

Court on direct review on June 3, 1991. Consequently, the 1993 cases of Graham and Johnson are not directly applicable to the present case. Moreover, the Court in Graham and Johnson specifically distinguished the mitigating evidence of the defendant's youth at the time of the offense in those cases from the mitigating evidence of abused childhood and mental retardation presented in Penry.

The Graham Court reaffirmed that Penry was still valid law requiring that, when a capital defendant presents mitigating evidence of either mental retardation or an abused childhood in a penalty phase under the Texas special issues, the jury must be given instructions that allow it to give effect to that mitigating evidence in determining whether to impose the death penalty. Graham, 506 U.S. at 473-75 ("Because it was impossible to give meaningful mitigating effect to Penry's evidence by way of answering the special issues, the Court concluded that Penry was constitutionally entitled to further instructions informing the jury that it could consider and give effect to Penry's evidence . . . by declining to impose the death penalty.) (internal quotations, citations, and brackets omitted). But the Court in Graham distinguished the effect of the Texas special issues upon the jury's ability to consider and give effect to Graham's mitigating evidence of youth. Id. at 475-76 ("Even if Graham's evidence, like Penry's, had significance beyond the scope of the first special issue, it is apparent that Graham's evidence—unlike Penry's—had mitigating relevance to the second special issue concerning his likely future dangerousness. Whereas Penry's evidence compelled an affirmative answer to that inquiry, despite its mitigating significance, Graham's evidence quite readily could have supported a negative answer.").

71

Graham's relevance, if any, has also been attenuated by the AEDPA's abrogation of the "reasonable jurist" standard applied in that case. See Williams, 529 U.S. at 410 (interpreting the AEDPA as expressly disapproving the "reasonable jurist" standard used in Graham, Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir. 1997), and other cases; holding instead that the AEDPA requires the application of an "objective unreasonable" standard).

The Johnson Court also reaffirmed Penry, but distinguished the mitigating evidence of capital defendant Johnson's youth at the time of the offense from the abused childhood and the mental retardation of Penry as being a different type of evidence to which a jury could give full mitigative effect under the Texas special issues. Johnson, 509 U.S. at 369.

IV.

A.

The decisions of the Texas Court of Criminal Appeals regarding Hernandez's Sixth and Eighth Amendment claims were "contrary to, and involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," 28 U.S.C. § 2254(d)(1). The next appropriate step in the required analysis is to determine whether and to what extent any harmless error rule is applicable to the constitutional error underlying each state-court decision.

In Arizona v. Fulminante, 499 U.S. 279, 307-08 (1991), the Supreme Court recognized two categories of constitutional violations, which it characterized as "trial error" and "structural defects." Trial error "occur[s] during the presentation of the case to the jury," and is amenable to harmless-error analysis because it "may . . . be quantitatively assessed in the context of other evidence

72

presented in order to determine [the effect it had on the trial]." Id. Structural defects "in the constitution of the trial mechanism, which defy analysis by 'harmless-error' standards[,]" id. at 309, "require[] automatic reversal of the conviction because they infect the entire trial process." Brecht v. Abrahamson, 507 U.S. 619, 629-30 (1993) (citing Fulminante, 409 U.S. at 309).

Prior to the AEDPA, in reviewing petitions for habeas relief with respect to constitutional "trial" errors, we determined whether a constitutional violation was harmless error by asking whether the error "'had substantial and injurious effect or influence in determining the jury's verdict.'" Brecht, 507 U.S. at 623 (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)). Under this standard, however, "where the record [was] so evenly balanced that a conscientious judge is in grave doubt as to the harmlessness of the error," the petitioner

would prevail. O'Neal v. McAninch, 513 U.S. 432, 436 (1995). "We recognize[d] . . . that if our minds are 'in virtual equipoise as to the harmlessness,' under the Brecht standard, of the error, then we must conclude that it was harmful." Woods v. Johnson, 75 F.3d 1017, 1026-27 (5th Cir. 1996) (citing O'Neal, 513 U.S. 432 (1995)).

There is a division among circuits as to whether the Brecht-O'Neal standard survived the AEDPA. The Sixth Circuit has held that "the test set out by the Supreme Court in Kotteakos and explicitly reiterated in Brecht quite precisely captures Congress's intent as expressed in the AEDPA and, therefore, continues to be applicable." Nevers v. Killinger, 169 F.3d 352, 371 (6th Cir. 1999). The Eighth Circuit has noted, however, that, even in the wake of the Supreme Court's decision in Williams, it is "not convinced that the AEDPA did not abrogate the requirement that federal habeas courts conduct a harmless

73

error analysis under Brecht." Whitmore v. Kenna, 213 F.3d 431, 433 (8th Cir. 2000). The Tenth Circuit has recognized the possible tension between the Brecht-O'Neal standard and the AEDPA, but has expressly declined to determine whether application of Brecht-O'Neal in an AEDPA case is erroneous. See Anderson v. Cowan, 227 F.3d 893, 898 n.3 (10th Cir. 2000); Thomas v. Gibson, 218 F.3d 1213, 1226 n.12 (10th Cir. 2000); Bryson v. Ward, 187 F.3d 1193, 1206 n.10 (10th Cir. 1999).

Though the Supreme Court in Williams does not expressly confront the tension between Brecht-O'Neal and the AEDPA in its analysis of the effects of the AEDPA on the federal habeas scheme, it does appear to implicitly recognize Brecht's vitality: "It is, of course, well settled that the fact that constitutional error occurred in the proceedings that led to a state-court conviction may not alone be sufficient reason

for concluding that a prisoner is entitled to the remedy of habeas." Williams, 529 U.S. 375 (citing Brecht, supra).

The issue of a possible Brecht-O'Neal-AEDPA tension or conflict is not present in this case, however, because the State's violation of Hernandez's Eighth Amendment right is a structural defect that requires automatic reversal, and the State's violation of his Sixth Amendment right to counsel cannot be regarded as harmless, even under the most state-friendly Brecht standard.

B.

1.

A Penry violation is a structural defect defying analysis by harmless error standards and requires automatic reversal of the death sentence because it infected the entire penalty phase. The Supreme Court, upon finding that

74

a jury in a capital murder case was precluded by a Penry-type defect in the constitution of the penalty trial mechanism from being able to give effect to constitutionally relevant mitigating evidence, in violation of the Eighth Amendment, has never subjected the defect to a harmless error analysis. See, e.g., Penry, 492 U.S. at 328; Skipper v. South Carolina, 476 U.S. 1, 8-9 (1986); Eddings v. Oklahoma, 455 U.S. 104, 116-17 (1982); Lockett v. Ohio, 438 U.S. 586, 608-09 (1978); see generally 2 JAMES S. LIEBMAN & RANDY HERTZ, FEDERAL HABEAS CORPUS PRACTICE AND PROCEDURE § 32.3, at 1345 & n. 43 (3d ed. 1998). This result inheres in the nature of the Penry violation itself. When the Eighth Amendment's proscription against cruel and unusual punishment is violated because a jury must determine whether to impose a death sentence without being able to fully give effect to relevant mitigating evidence, the structure of the sentencing trial mechanism itself creates the constitutional violation. Consequently, the defect is not amenable to harmless-error analysis because it cannot be quantitatively assessed in the context of other evidence presented in a constitutional system that permits the jury to give full effect to relevant mitigating evidence. Thus, a Penry violation is a structural defect that defies harmless error analysis and requires automatic reversal because it infects the entire penalty trial process.

2.

Under the Supreme Court's precedents, however, Hernandez's Sixth Amendment violation is subject to a harmless error analysis. The Supreme Court observed in Satterwhite that "[o]ur conclusion [that there is an Estelle v. Smith error] does not end the inquiry because not all constitutional violations

75

amount to reversible error." 486 U.S. at 257-58 (holding that a harmless error analysis applies to Sixth Amendment violations when the "violation is limited to the admission of particular evidence at trial."). In determining whether a similar violation was harmful under the Chapman standard for errors on direct review, the Satterwhite Court employed several factors, rejecting the approach of the court of appeals, which had simply examined the record to determine whether the properly admitted evidence was sufficient to support the jury's verdict. 486 U.S. at 258-59. The Court instead considered the properly admitted psychiatric evidence relevant to future dangerousness; the amount of weight the prosecution placed on the expertise of the psychiatrist who had impermissibly testified at the punishment phase; the amount of weight the prosecution placed on the improperly admitted psychiatric evidence in the closing argument; and the unequivocal nature of the improperly admitted psychiatric testimony. Id. at 259-60.

Although I have examined the Sixth Amendment violation in Hernandez's case under the Brecht-O'Neal standard, the same factors that the Supreme Court examined in Satterwhite in its Chapman review appear to be relevant here as well. First, the prosecution relied solely on Dr. Sparks's testimony for expert evidence of Hernandez's future dangerousness, eliciting no testimony from any other psychiatrist or psychologist.

Second, in eliciting Dr. Sparks's testimony and in its closing argument, the prosecution placed great emphasis on his expertise. For two-and-a-half pages of the trial record, Dr. Sparks elaborated on his background and expertise, discussing his twenty-five years as a psychiatrist, his years of work in the criminal justice system, and his examination as a forensic psychiatrist of more than 1500 people

76

accused of crimes in the previous five years. Cf. id. at 259 (finding significant Dr. Grigson's testimony that he had taught psychiatry in a Dallas medical school and had practiced psychiatry for twelve years). In its closing argument, the prosecution emphasized these expert credentials, stating, "Here's a man trained in forensic psychiatry, here's a man who has examined over 1500 people and testified in court over 400 times, a man who's not the average psychiatrist who sits behind a desk and talks about our phobias and our problems, but a man who has seen the inner mind of the primitive man." Cf. id. at 260 (finding significant that "[t]he District Attorney highlighted Dr. Grigson's credentials . . . in his closing argument."). That Dr. Sparks's expertise was emphasized has direct bearing on the question of whether his testimony was a substantial influence on the jury's verdict. Cf. id. at 259 ("[Dr. Grigson's] testimony

stands out because of his qualifications as a medical doctor specializing in psychiatry . . . .").

Further, the prosecution placed a great deal of weight on Dr. Sparks's testimony in its closing argument:

[Dr. Sparks] told you, yes, "Yes, he does constitute a continuing threat to society." "What is your impression, Doctor, relative to your diagnosis?" "He's antisocial, he's a sociopath, he's what we used to call psychopathic." "What does that mean, Doctor?" "Well, that means he cannot love, he has no compassion, he can kill indiscriminately."

After detailing this section of Dr. Sparks's testimony, the prosecution elaborated on the implications of Dr. Sparks's diagnosis of Hernandez as a sociopath. Cf. id. at 260

(quoting the District Attorney's closing argument about Dr. Grigson's testimony: "'[Satterwhite is a] [s]evere sociopath. Extremely dangerous. A continuing threat to our society. Can it be cured? Well, it's not a disease. It's not an illness. That's his personality.'").

Dr. Sparks was unequivocal in his testimony regarding Hernandez's future dangerousness. He stated that an offender who had committed a crime identical in every detail with Hernandez's offense had an antisocial personality disorder and was therefore a continuing threat to society. He revealed that, based on his examination of Hernandez, Hernandez had an antisocial personality disorder. Even when confronted with records that might have indicated that Hernandez's behavior was attributable to paranoid schizophrenia, he adhered to his original conclusion based on his examination of Hernandez that Hernandez's behavior was attributable to the antisocial personality disorder, conceding only that he would have altered his diagnosis to reflect paranoid schizophrenia in remission, in addition to the antisocial personality disorder.

Taking all of the foregoing relevant factors into account, and viewing the Penry violation within the context of the entire record, I believe we should conclude that Dr. Sparks's testimony in violation of Hernandez's Sixth Amendment right had a substantial and injurious influence on the jury's determination of the issue of future dangerousness, and was therefore not a harmless error under Brecht.

## Conclusion

For the reasons assigned, the decision of the Texas Court of Criminal Appeals rejecting Hernandez's Sixth and Eighth Amendment claims was contrary to and an unreasonable application of clearly established Federal law

78

as determined by the decisions of the Supreme Court; and the majority opinion of this court is in error in not reversing the decision of the district court and in not remanding this case to that court for the issuance of a writ of habeas corpus.